**UNITED STATES of America,
Appellee,**

v.

**James Louis NAZZARO, Appellant.**

**No. 350, Docket 72–1791.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 13, 1972.

Decided Jan. 11, 1973.

Allen G. Schwartz, New York City (Paul B. Bergins, White Plains, N. Y., on the brief), for appellant.

Raymond J. Dearie, Asst. U. S. Atty. (Robert A. Morse, U. S. Atty., for the E.D.N.Y., L. Keven Sheridan, Asst. U. S. Atty., on the brief), for appellee.

Before KAUFMAN, ANDERSON and OAKES, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

■ Rarely is there a case reaching us after conviction in which the defendant believes he has received a fair trial. The human tendency to blame a trial judge for the jury's verdict of guilt is a frailty we often encounter, and almost as frequently we find such claims to be without merit or substance. Once again we are asked by a convicted defendant to consider a claim of improper conduct on the part of a trial judge. In this instance, however, we believe the record amply demonstrates that the defendant, James Nazzaro, did not receive a fair trial. Although "it is one of the glories of federal criminal law administration that a district judge is more than a moderator or umpire. . . ," United States v. Curcio, 279 F.2d 681, 682 (2nd Cir.), cert. denied, 364 U.S. 824, 81 S.Ct. 59, 5 L.Ed.2d 52 (1960), a judge's participation during trial—whether it takes the form of interrogating witnesses, addressing counsel, or some other conduct —must never reach the point at which it appears clear to the jury that the court believes the accused is guilty. Nazzaro, who was convicted after trial before Judge Rosling and a jury for receiving, concealing, and facilitating the transportation of eight and one-half pounds of hashish, in violation of 21 U.S.C. §

176a,[1] maintains that the trial judge's conduct in examining witnesses—particularly the defendant himself—and in repeatedly harassing Nazzaro's counsel, so severely prejudiced the defense as to make a fair trial impossible.

■■ There is simply no handy tool with which to gauge a claim that a judge's conduct improperly has shifted the balance against a defendant. Understandably, we reach a decision in such cases only after the most thorough and careful deliberation. We frankly recognize that appellate review of criminal cases, always a difficult task, becomes even more hazardous when the question presented involves an attack upon the conduct of a judge. The special quandary we face in such cases stems from the fact that "we are not given the benefit of witnessing the juxtaposition of personalities which may help prevent reading too much into 'the cold black and white of a printed record' ". United States v. Grunberger, 431 F.2d 1062, 1067 (2nd Cir. 1970). Moreover, appellate review does not take place in a vacuum. We must be mindful of the fact that trials in the district courts are not conducted under the cool and calm conditions of a quiet sanctuary or an ivory tower, and that enormous pressures are placed upon district judges by an ever increasing criminal docket[2] and a demand, expressed in part by Rules of the Second Circuit Judicial Council, for speedier trials of criminal defendants. These pressures can cause even conscientious members of the bench, such as the trial judge in this case, in their anxiety to keep pace with the flood of litigation, to give vent to their frustrations by displaying anger and partisanship, when ordinarily they are able to suppress these characteristics. But grave errors which result in serious prejudice to a defendant cannot be ignored simply because they grow out of difficult conditions. A claim of unfair judicial conduct, under these circumstances, requires a close scrutiny of each tile in the mosaic of the trial so that we can determine whether instances of improper behavior or bias, when considered individually or taken together as a whole, may have reached that point where we can make a safe judgment that the defendant was deprived of the fair trial to which he is entitled. United States v. Guglielmini, 384 F.2d 602, 605 (2nd Cir. 1967). On the record before us, we are left with the inescapable conclusion that the judge's conduct during trial seriously prejudiced the defendant. Accordingly, we are constrained to reverse Nazzaro's conviction and remand for a new trial.[3]

1. Nazzaro received a sentence of five years imprisonment. A second charge, failure to pay a transfer tax on the hashish, 26 U.S.C. § 4744(a)(2), was dismissed prior to trial on the government's motion.

2. During Fiscal Year 1972, the number of criminal filings in the Eastern District of New York—which makes a special effort to begin trial of all criminal cases within six months of arrest—was 1422, an increase of almost 150% over the 581 filings during Fiscal Year 1962. Compare 1972 Annual Report of the Director, Administrative Office of the United States Courts Table 31, with 1962 Annual Report of the Director, Administrative Office of the United States Courts Table D 1.

3. Nazzaro also claims that the indictment should be dismissed for failure to comply with this Circuit's Rules Regarding Prompt Disposition of Criminal Cases and because of a denial of his Sixth Amendment right to a speedy trial. These claims are meritless. Nazzaro was arrested on February 27, 1970 and indicted on October 29, 1970. The government's Notice of Readiness For Trial was timely filed on June 28, 1971, a week before the effective date of the Second Circuit Rules. Conceding that a valid readiness notice filed on that date would satisfy the government's obligations under the Rules, Nazzaro contends that the notice was meaningless because the government had failed to provide certain discovery. But defense counsel's affidavit submitted in support of his motion to dismiss, dated January 20, 1972, and his statements at a hearing on this motion on February 4, 1972, reveal that there was only an informal agreement by the government to disclose certain documents

## I.

A brief recital of the facts adduced at the trial will aid us in considering Nazzaro's principal claim. Nazzaro's trial focused upon incidents involving a large trunk shipped from Morocco to New York City via Air France. The trunk, containing some articles of women's clothing and a blanket, arrived at the Air France cargo terminal at Kennedy International Airport on December 25, 1969. Concealed within a false panel at the bottom of the trunk were eight and one-half pounds of hashish. Two months later, on February 25, 1970, an undated Air France arrival notice was delivered through the mail to Nazzaro's apartment at 17 West 20th Street in Manhattan.[4] The notice—addressed to Nazzaro Studio of Design[5]—stated that a shipment had been received by the airline and that storage charges were accruing. In the early afternoon of February 27, a friend drove Nazzaro to Air France's cargo building at Kennedy Airport.[6] When Nazzaro presented the arrival notice to an employee at the Air France freight counter, he was given additional shipping documents and instructed to go to the United States Customs Office, located at the far end of the counter. The additional documents —an airway bill and a carrier's certificate—indicated that the trunk had been shipped from Morocco by Judy Hoffman and George Armstrong.

As Nazzaro walked towards the Customs section, an Air France employee placed the trunk on a counter in front of Inspector Frank Pisciotta. Pisciotta testified at trial that after examining the documents which Nazzaro handed to him, he asked Nazzaro if he owned the trunk. Nazzaro responded, according to Pisciotta, that a friend, Judy Hoffman, had written a letter requesting him to claim the trunk and hold it until she returned to the United States from Morocco. Pisciotta claimed that Nazzaro expressed a willingness to pay any duty imposed on the contents of the trunk.

Nazzaro's version of this incident differed sharply from Pisciotta's. Nazzaro, who maintained during trial that he did not know anyone named Judy Hoffman, testified that the arrival of the Air France notice completely mystified him. He stated that after Air France refused to disclose any information about the shipment over the telephone, he went to the airport to seek an explanation. According to Nazzaro, he talked with Pisciotta only about accrued storage charges.

Pisciotta, after this conversation with Nazzaro, inspected the trunk. An apparent two-inch discrepancy between its inside and outside depth measurements and the fact that the trunk was only half full immediately aroused his suspicions. Pisciotta and another inspector then carried the trunk to a back room.

---

no later than one week in advance of trial. Nazzaro's vague and conclusory claims of prejudice—regarding destroyed Air France records and unavailable witnesses—cannot support a claim under the Sixth Amendment. Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

4. Also living in the apartment with Nazzaro were Mara Lepmanis, his girlfriend, and Phillip Nazzaro, his younger brother. Phillip recently had separated from his wife Jennifer.

5. Nazarro testified that the apartment lease was executed in a business name because the building was located in a commercially zoned area.

6. The friend, Matt Reynolds, was employed as a truck driver. Reynolds and Nazzaro each testified that they met at noon on the 27th of February in the Riviera Bar and Restaurant, located near Nazzaro's apartment in Greenwich Village. Reynolds testified that his employer had instructed him to deliver a shipment to a warehouse in Long Island City and that he volunteered to drive Nazzaro at least that far. After arriving at the warehouse, Reynolds was told there would be a one-hour delay before a return shipment was ready. He then decided to drive Nazzaro to the airport, but did not wait to drive Nazzaro back to Manhattan.

While Nazzaro stood to the side, Pisciotta cut a small hole in the bottom of the trunk with a pocket knife. The opening revealed a plastic wrapping containing a substance which Pisciotta believed was hashish. Pisciotta immediately telephoned the airport headquarters of the Bureau of Customs to report his discovery. In response, Special Agent Frank Farrell and Customs Port Investigator James Voloposille went to the Air France cargo building to investigate. Farrell examined the false bottom and concluded that the substance contained in the plastic wrapping was hashish. Farrell then informed Nazzaro that he was under arrest, advised him of his rights, and placed handcuffs on him.

After taking the trunk to their government automobile, Farrell and Voloposille drove Nazzaro to the Bureau of Customs's airport office. Agent Farrell testified that during this trip he commented on the large quantity of seized hashish. According to Farrell, Nazzaro responded by saying, "I didn't think there would be that much hash." In addition, Farrell claimed that Nazzaro answered, "She's not here," when asked about Judy Hoffman's identity. At trial, Nazzaro vigorously denied making the statements attributed to him.

After a brief stop at the airport office, Farrell and Voloposille drove Nazzaro to the Bureau of Customs headquarters at 201 Varick Street in Manhattan. Farrell escorted Nazzaro to a room located on the third floor for questioning by Special Agent Donald Donohue, who was in charge of the investigation. Donohue did not summon a stenographer to transcribe the subsequent interrogation nor did he prepare a written report recording the substance of the interview. At the trial twenty-six months later, he was able, nevertheless, to recall perfectly that in response to

questioning, Nazzaro stated that he had gone to the airport to claim a trunk for his friend, Judy Hoffman. According to Donohue, Nazzaro admitted that he "knew he was going to get some hash [but] didn't think it would be quite that much." While Donohue interrogated Nazzaro, Farrell removed the entire bottom of the trunk in the hall outside the interview room, revealing twenty bags of hashish. When Nazzaro left the room with Donohue at the conclusion of the interrogation, he saw the packages and, again according to Donohue, stated, "I told you, I did not know it was going to be that much stuff."

Nazzaro's recollection of this interview sharply contradicted Donohue's. Nazzaro flatly denied acknowledging an acquaintance with Judy Hoffman or ever stating that he was expecting "some" hashish, but not "that much."

■ The government's case against Nazzaro thus relied heavily upon admissions—uncorroborated by any written memoranda—allegedly made by Nazzaro to Pisciotta, Farrell and Donohue. At trial, Nazzaro conceded that he had gone to the airport with the arrival notice. He denied, however, any familiarity with a person named Judy Hoffman and insisted that he did not know why he was notified of the trunk's arrival, nor did he know anything about its contents. The theory of the defense was that Nazzaro's sister-in-law, Jennifer Nazzaro—who was travelling in Morocco during December, 1969—had shipped the trunk to "Nazzaro Studio of Design" on West 20th Street without giving any advance notice or warning of its contents. According to Nazzaro, Jennifer, who was separated from her husband Phillip, probably intended the trunk for either Mara Lepmanis—Jennifer's close friend —or Phillip Nazzaro, who shared the apartment with James and Mara.[7] Ac-

---

7. As part of his proof, Nazzaro sought to introduce a letter written by Jennifer Nazzaro to Mara Lepmanis. He offered the letter, dated December 15, 1969, to show that Jennifer was in Morocco during the time the trunk was shipped. The

thirteen longhand pages of the letter related Jennifer's experiences while she was travelling through Spain and North Africa and mentioned purchases of small quantities of hashish in Morocco. The government objected to introduction of

cordingly, in view of the fact that each government witness recalled his version of the three conversations without the benefit of any written memoranda, resolution of Nazzaro's guilt or innocence turned upon the jury's view of the credibility of the witnesses presented by each side. The question for the jury thus necessarily focused on whether Nazzaro in fact did admit that he was expecting the arrival of a trunk containing hashish from Judy Hoffman.

It is in this context that we turn to Nazzaro's claim that the trial judge so interfered with the course of trial as to preclude a fair resolution of the factual dispute.

## II.

■ There is no dispute among the parties that the judge participated extensively in the examination of all witnesses. Several such instances, however, occurred only "where [it was] necessary to clarify testimony and assist the jury in understanding the evidence," United States v. DeSisto, 289 F.2d 833, 834 (2nd Cir. 1961).[8] But "while it might be proper for a judge to question witnesses to clarify issues, such intervention should not become the rule." United States v. D'Anna, 450 F.2d 1201, 1206 (2nd Cir. 1971). It is clear from the record that on frequent occasions during the trial of this case, the judge's questions unmistakably rehabilitated a prosecution witness whose credibility had been undermined by defense counsel.

At other times, the court's questions appeared designed to inject doubt or uncertainty as to the credibility of a defense witness. While we must forego an enumeration of all instances of misconduct revealed by the record if we are not to prolong unduly this opinion, a few examples will suffice.

In the course of cross-examination of Special Agent Donohue, counsel for Nazzaro attempted to explore inconsistencies between Donohue's testimony during direct examination and his statements to the Grand Jury that indicted Nazzaro. The following ensued:

Q. Isn't it a fact that you never told the Grand Jury that Judy Hoffman was a friend of [Nazzaro's] ?

A. Not if I weren't asked.

Q. Isn't it a fact that you never told—

The Court: Counselor, the witness has just stated that he responded to questions.

Do you have any questions you want to confront him with? Don't ask him whether he told them—there are a lot of things he didn't tell them.

You didn't tell them that Columbus discovered America in 1492, did you?

The Witness: I wasn't asked, your Honor.

The Court: You may continue, but not in that form.

Q. Had you told the U.S. Attorney, prior to the Grand Jury presentation,

the letter, asserting that it was both irrelevant and hearsay. Prolonged discussion of whether the judge erred in sustaining this objection is unnecessary since we believe that if it was error not to admit the letter in evidence, it was harmless. The information in the letter was adduced during Mara Lepmanis's testimony:

Q. Miss Lepmanis, did you ever receive any correspondence from any person in the Middle East, or in North Africa, Morocco, with respect to their having possession of or purchasing hashish?

A. Yes.

Q. From whom?

A. Jennifer.
The Court: She mentions that in her letter, doesn't she?
The Witness: Yes.

8. For example, near the outset of Inspector Pisciotta's testimony, the prosecutor asked him to describe his duties:

A. Well, our main function is to protect the Revenue Act of the United States—
The Court: Now, don't put it in legal gobbledygook.
The Witness: All right.
The Court: Put it in jury language. What are you supposed to do?

that the defendant had told you about a letter he was going to get?

A. Yes, sir.

Q. And you were not asked the question and didn't give the answer in the Grand Jury?

A. That is correct.

The Court: Members of the Jury, whether or not he got a letter or not is irrelevant to the charge here. So it may be that that was why he wasn't asked.

Do not raise your voice in such indignation, counselor.

Mr. Schwartz: I am trying not to do that.

The Court: But you are doing it. The Jury knows I'm not inventing this, they hear you.

There were numerous similar occasions in which the judge came all too quickly to the aid of a prosecution witness during cross-examination. The impact of these instances was such that the jury could only believe that the judge favored the government's witness and his version of the facts.

Even more damaging was the judge's persistent questioning of defense witnesses, particularly the defendant Nazzaro himself. The trial judge often assumed the prosecutor's role, interposing questions which clearly indicated disbelief in the defendant's testimony. One illustration will suffice. During Nazzaro's testimony, he asserted that the Air France employees had referred him to a Customs official for discussion of accrued storage charges on the trunk. Nazzaro was met with a lengthy barrage of questions by the judge aimed at demonstrating the improbability that a United States Customs Inspector would be concerned with an airline's storage charges:

The Court: Let me ask you this, this letter about storage charges didn't come from the United States Government, did it?

The Witness: I don't believe so.

The Court: Who did it come from?

The Witness: Air France.

The Court: Now, you went to the Air France people, didn't you?

The Witness: Yes.

The Court: With their arrival notice.

The Witness: Yes, sir.

The Court: And the arrival notice said, "Storage charges are accruing in accordance with the provisions set forth in IATA Resolution 512–B."

Do you know what that means, "storage charges are accruing"?

The Witness: Yes.

Q. When you went to the airplane people to get these other papers, did they tell you that they were holding the trunk for some storage charges?

The Witness: They didn't tell me anything.

The Court: They gave it to you even though the storage charges were accruing?

The Witness: They said take it down to the Customs Inspector and maybe he can do something about it; that's what they told me.

The Court: He can do something about what?

The Witness: I assume they meant the charges, storage charges.

The Court: You mean the United States Government was concerned about the storage charges that Air France was accruing on this trunk?

The Witness: I don't know, that's what I was told. I had no idea what the procedure was. I had never done it before so I didn't know—

The Court: Over there at the Air France they didn't say "We got a lien on that trunk for storage charges?"

The Witness: No.

The Court: "And we are not going to give you this, these other two papers, until you pay us those charges."

The Witness: No, they didn't sir.

The Court: They just—

The Witness: Just handed me the two sheets of paper.

The Court: Didn't tell you it was a trunk even?

The Witness: Not that I remember.

The Court: Try hard to remember.

The Witness: All I remember is he just handed me those invoices, whatever they are, and said, "Go down the end of the counter and the Customs Inspector will—he'll take care of you."

Or something like that.

The Court: Nobody told you at that point that it was a trunk?

The Witness: I don't believe so.

The Court: You know, the next paragraph, after the one I read, this is also from Air France, reads: "If you do not claim this shipment within a period of seven days. . . . "—did you notice that?

The Witness: Yes.

The Court: Were you coming there to claim the shipment?

The Witness: I went there to inquire about it.

The Court: Inquire of whom?

The Witness: Air France.

The Court: You left Air France with their papers.

The Witness: It's in the same building. They are about ten feet apart.

It's no longer than this piece of wood here (indicating).

The Court: Do you know the difference between a Customs officer and somebody that works for the French airline, Air France? I think that is a French airline, isn't it?

The Witness: I thought they were all connected.

The Court: In other words, the Customs officers, they help Air France collect its bills, is that the way it goes?

The Witness: I don't know sir.

\*    \*    \*    \*    \*    \*

The Court: Did you ask the Customs people what the charges were?

The Witness: Yes.

The Court: What did they tell you, how much?

The Witness: They didn't tell me.

The Court: They didn't tell you that it was owing to the United States Government, storage charges?

The Witness: Not that I remember, no.

The Court: It wasn't owing to the United States Government, was it?

Mr. Schwartz: Your Honor, may I object to this. I think these questions were asked yesterday and they are being asked again repeatedly and they were asked yesterday.

The Court: Overruled.

Did you ask the Customs people what the charges of Air France were?

The Witness: I believe I asked them what the charges were about, or if they could tell me anything about the charges, about the package.

I don't remember what was said.

The Court: Did you ask them what the Air France charges were?

The Witness: I didn't ask them—I just asked them about the charges. I didn't know—I didn't know—

The Court: You thought these were charges of the United States Customs?

The Witness: I'd no idea. I'd never been in the building before. I'd never been through the procedure. I didn't know what was what.

■    The trial judge also frequently interrupted testimony of defense witness Matt Reynolds, the truck driver who drove Nazzaro to the airport. The questions clearly reflected disbelief in Reynold's version of the circumstances of the trip. For example, after Reynolds indicated that he had a one hour holdover between shipments, the trial judge strenuously cross-examined the witness in this fashion:

The Court: How long would you say the trip took from Long Island City to Air France?

The Witness: Roughly 20 minutes, sir.

The Court: 20 minutes?

The Witness: Yes, your Honor.

The Court: 20 plus 20, that is 40 minutes. That left you with 20 minutes more, didn't it? 20 minutes there, 20 minutes back, and 20 minutes free time?

The Witness: Well, I didn't make it exactly. I knew that I had enough time to take him out of there and come back safely.

The Court: Didn't you testify earlier that you estimated it would take you 15 to 20 minutes at that time of day?

The Witness: Yes. But, in other words—

The Court: So if it was as little as 15 minutes, you would have 15 minutes there, 15 minutes back, 5 [sic] minutes turnaround time, and you were still left with 15 minutes free?

The Witness: Well, I am just estimating, your Honor. I had plenty of time to take him out to the airport and come back and do what I was committed to do.

The Court: Could you have stayed there for 10 minutes or so to see what happened?

The Witness: Well, I had told Mr. Nazzaro that I just wasn't taking him back.

I didn't want to cut anything too close and get involved with anything like waiting on line because these things definitely take time.

I told him that it takes time, simply that, and I would not be able to wait for him. And he would have to take a cab.

The Court: You would not be able to take a load back?

The Witness: A—The point is, I am committed to somebody else for my time and service for the day. I couldn't get tied up with Mr. Nazzaro. I had a free hour where I would have to just sit at Columbia Letter or go out for a cup of coffee. And as much as I could do was to take him out to the airport, period.

The Court: You couldn't wait 20 or 25 minutes?

The Witness: No, I couldn't.

The Court: And then put it in your almost completely empty truck and cart it back?

The Witness: No, sir.

Where the defendant's guilt or innocence rests almost exclusively on the jury's evaluation of the witnesses' demeanor and credibility, we cannot ignore questioning undertaken by a judge which so clearly signals to the jury the judge's partisanship. Even if a judge's interjections are not motivated by a partisan purpose, "he must not . . . permit even the appearance of such an interference." United States v. Curcio, 279 F.2d 681, 682 (2nd Cir. 1960). The court's vigorous participation in examining Nazzaro and Reynolds, especially when contrasted with the relative freedom from hostile interruption of the prosecution's witnesses, could not avoid conveying to the jury that the judge did not believe Nazzaro and the other defense witnesses.[9]

9. We also consider regrettable the court's concern with the existence of physical hygiene facilities in Nazzaro's apartment. For example, during the testimony of Irving Barry, a friend of Nazzaro's, the following colloquy occurred:

The Court: Where was the bathroom, the toilet in [Nazzaro's apartment]?
  \*    \*    \*    \*    \*
The Witness: Well, as you came in the door, it was on your left. It was another—It was a room that had been built up and newly piped out, you know, new plumbing fixtures, et cetera.

The Court: Bathtub in it?
The Witness: A bathtub—
The Court: A shower?
The Witness: There may have been a shower. I don't know if there was a bathtub.
The Court: There may have been a shower?
The Witness: Right, there may have just been a shower stall. I don't remember if there was a bathtub.
The Court: Well, would it be a situation without a bathtub and without a shower?

Other incidents reinforce our conclusion that Nazzaro must receive a new trial. The judge engaged in numerous acrimonious exchanges with defense counsel, many of which occurred in the presence of the jury.[10] The following

The Witness: Could it have been without a bathtub—

The Court: Without either—without both?

The Witness: I don't really remember.

The Court: I see. This was a special type of an apartment, wasn't it?

The Witness: Right.

Moreover, in the context of this trial, the court's effort to link addresses mentioned by defense witnesses with the Greenwich Village area was unfortunate. For instance, immediately after Matt Reynolds was sworn as a witness by the clerk and stated his address as 194 Bleecker Street, New York, New York, the trial judge asked, "That is in Greenwich Village, isn't it?"

These comments on matters totally irrelevant to the case could only have placed the defendant in an unfair light before the jury, as did the following unnecessary exchange, which took place while Nazzaro described how Inspector Pisciotta cut a hole in the trunk at the airport:

The Witness: And then the hashish or whatever was in it came out, fell on the ground.

The Court: Well, what did the hashish look like?

The Witness: What I have seen here, that green—green—

The Court: Was that the first time in your life you ever saw hashish?

The Witness: In that quantity, yes?

The Court: In that quantity?

The Witness: Yes.

The Court: You have seen it in a smaller quantity?

The Witness: Yes.

10. One such instance occurred during direct examination of Reynolds:

Q. [defense counsel] Now, Mr. Reynolds, continue with the conversation. You told him that it was at the Cargo Building, and he had to go out there to find out?

A. Right. He asked me if—

The Court: Did he say that?

The Witness: Excuse me, sir?

The Court: Did you say he had to go out there to find out?

The Witness: He asked me—

The Court: Suppose it was you—

Mr. Schwartz: [defense counsel] May he answer the question, please?

The Court: Counselor—

Mr. Schwartz: Please let him answer the question, your Honor.

The Court: Don't put yourself in that position in front of the jury as though the Court was oppressing you. The Court is not.

Now, you remain silent, please.

Other exchanges, although occurring during side bar discussions or while the jury was not present in court, indicate the acrimonious atmosphere that permeated the courtroom. During a discussion concerning the permissible scope of cross-examination of Inspector Pisciotta, the following is recorded:

The Court: You should be before some of the other judges—and I have one in particular in mind—you wouldn't have gotten a fraction of the testimony in. You would not have had the problem with the jury because the judge asks all the questions of the jury and doesn't go into any detail and—He would be saying, "Come, come, let's hurry, let's hurry."

You know, the kind of motion you made in this case some time back, the motion—you made a motion to dismiss because I could not get to the case, notwithstanding—

Mr. Schwartz: That was not why. Desmond O'Sullivan [an Assistant U.S. Attorney formerly in charge of the case] promised me those papers for fourteen months, that's why I moved, not because of your Honor. I think you have disliked me since that time.

The Court: If you want to get on an emotional basis, you may.

Mr. Schwartz: I don't. I want to take out the personal feelings between us. I don't want to have any personal feeling.

The Court: Counselor, the jury box is empty, and I will tolerate some things that come close to being contemptuous—

Mr. Schwartz: I am only talking to your Honor without the jury.

The Court: You have now interrupted me four times. You are about twenty-five or thirty-five years my junior and I have not got the strength to cope with you, but I do have the power—so just stop it.

The motion referred to was the January 20, 1972 motion to dismiss for denial of a speedy trial, see note 3, supra. The pressures of overwork which un-

disturbing colloquy was marked by the court reporter as occurring "at the side bar . . . out of the hearing of the Jury," but, as appears from certain of the quoted statements below, some of it may have been overheard by the jury:

Mr. Dearie [the prosecutor]: I do not want to be dramatic about this, your Honor. And I'm sure it is not intended, but Mr. Schwartz is nodding yes and nodding no while the witness is testifying.

The Court: You are in good shape. When I had an adversary that was nodding to the witness on the stand, I welcomed it because—

Mr. Schwartz [defense counsel]: I am not aware of it. If you want to point it out to me, I will turn away—

The Court: —I never even bothered to say anything—

Mr. Schwartz: I think the Jury can hear this and it is not helpful.

The Court: Well, keep your voice down. And lipreading won't do them any good because my back is turned to them. But my experience has been that with a witness on the stand—

Mr. Schwartz: May I leave the side bar conference? I do not want to discuss this.

The Court: You will remain here. Indicate that he remains. My experience has been if signals are given to a witness—

Mr. Schwartz: Oh, my god—

The Court: Will you keep still. You are attracting the attention of the Jury.

Mr. Schwartz: I am not doing any such thing, so help me god. I do not want to stay at the conference.

The Court: You can stay in jail, if you prefer that. Just remain here. We are in the middle of a criminal trial. My experience has been—and this is an explanation of my ruling— that when a witness is on the stand and receives signals from an attorney or from anybody else he is receiving them only when he is in trouble and he doesn't understand what the signals mean.

So I overrule your objection.

■ In several instances the judge's remarks were prompted by counsel's failure to comply with rulings on the scope of cross-examination, but these comments, when considered along with other instances of inappropriate judicial participation, destroyed the "impartial, judicious, and, above all, responsible . . . courtroom atmosphere in which guilt or innocence [must] be soberly and fairly tested." United States v. Brandt, 196 F.2d 653, 655 (2nd Cir. 1952). *See* United States v. Dellinger, 472 F.2d 340 at 385–391 (7th Cir. 1972). Although in most circumstances a damaging impression may be mitigated by a jury instruction which emphasizes that "comments or questions by the court [are] not to be construed as in any way expressing any opinion or view on the part of the court whatsoever," United States v. Cruz, 455 F.2d 184, 185 (2nd Cir. 1972), United States v. D'Anna, 450 F.2d 1201, 1206 (2nd Cir. 1971), "such admonitions may offset [only] brief or

doubtedly were a contributing factor to this conscientious trial judge's demeanor during trial were evident at the February 4, 1972 hearing held on this motion:

The Court: Look, I will tell you [defense counsel, Mr. Schwartz] something: You sit down there and I'll tell you something about manners in the Court. Most courts have only one lawyer standing. Will you sit down, please.

Now, in my Court, nobody addresses the Court from a seated position. Sit down. Sit down.

All right, and if you wish to speak, you ask permission. Then if I say you can rise, then you can address the Court.

Mr. Schwartz: May I speak, your Honor?

The Court: No. Remain seated. Just keep calm.

The hour is late. I am in the middle of a trial. I don't know how to do everything I have to do today.

minor departures from strict judicial impartiality." United States v. Brandt, 196 F.2d 653, 656 (2nd Cir. 1952). Even if the trial judge's charge on this score had not been as cursory as it actually was,[11] we do not believe the error in this case could have been cured. The only remedy for the prejudice suffered by the defendant here is to reverse the conviction and grant him a new trial. United States v. Grunberger, 431 F.2d 1062 (2nd Cir. 1970); United States v. DeSisto, 289 F.2d 833 (2nd Cir. 1961); United States v. Brandt, 196 F.2d 653 (2nd Cir. 1952).[12]

In sum, after careful review of the entire trial record, we are constrained to arrive at the conclusion that the defendant did not receive a fair trial. Certainly a trial judge must be something more than a useless appendage to the trial. He bears the responsibility of insuring that the facts in each case are presented to the jury in a clear and straightforward manner. Yet an appearance of impartiality and judicious detachment must prevail at all times. While concededly the line separating permissible and impermissible judicial conduct in the courtroom is drawn with the finest point, we are of the firm view that the line was crossed in this case. Accordingly, it is our duty to reverse the conviction and remand for a new trial.

11. The extent of the charge on the judge's views was:

In the course of trial it has been necessary for me to rule on the admission of evidence and on motions made with respect to the applicable law. You must not infer from any such ruling I have made or from anything that I have said during the course of trial that I hold any views for or against the defendant in this prosecution.

12. We also believe it was not appropriate to exempt Special Agent Donohue from an order excluding witnesses from the courtroom. Over Nazzaro's objection, Donohue was allowed to sit at the prosecutor's table during trial. We recognize that "since the chief investigating agent may be of significant help to the prosecution during the course of a trial, the

trial court has discretion to make an exception to the general rule of sequestration of witnesses." United States v. Pellegrino, 470 F.2d 1205 at 1208 (2nd Cir. 1972). But even cautionary instructions to the jury immediately before the agent's testimony, as were given in *Pellegrino*, would have been inadequate in a case such as this, in which Donohue's credibility was a crucial element in the government's case against Nazzaro. Nevertheless, Judge Rosling failed even to give such a limiting instruction. Regardless of how imperceptibly the jury's view of Donohue's testimony may have been affected, under the circumstances present here it would have been better to exclude Donohue.