Dexter M. BROWN, Appellant,

v.

UNITED STATES, Appellee.

No. 11939.

District of Columbia Court of Appeals.

Argued March 8, 1978.

Decided May 31, 1978.

Rehearing Denied July 19, 1978.

---

John P. Bankson, Jr., Washington, D. C., appointed by this court, with whom Jeffrey M. Petrash, Detroit, Mich., was on the brief, for appellant.

Frederick A. Douglas, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Peter E. George and Stephen R. Spivack, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before KERN, YEAGLEY and HARRIS, Associate Judges.

KERN, Associate Judge:

■ A jury found appellant guilty of first-degree burglary while armed, D.C. Code 1973, §§ 22–1801(a), –3202; armed robbery, D.C.Code 1973, §§ 22–2901, –3202; assault with intent to commit robbery while armed, D.C.Code 1973, § 22–501; and two counts of assault with a dangerous weapon, D.C.Code 1973, § 22–502.[1] Subsequently, he was sentenced to concurrent terms of incarceration of 15 to 45 years for the convictions of first-degree burglary while armed, armed robbery, and assault with intent to

commit robbery while armed, and three to nine years on each count of assault with a dangerous weapon.

On appeal he contends (1) that the trial court committed reversible error by violating its own rule on witnesses in permitting the government to reopen its direct examination of an eyewitness to the crime following consultations between the witness, the prosecutor, and a police officer who became a subsequent witness for the government; (2) that the trial court erred by permitting counsel to conduct an initial voir dire of an 11-year-old eyewitness outside the jury's presence and then to pursue a similar voir dire in the presence of the jury; and (3) that the trial court abused its discretion by refusing to give a missing witness instruction with respect to an eyewitness to the offense who was not called to testify by the government. We affirm the convictions.

Sylvester Farmer testified at trial that at approximately 2:30 a. m. on January 27, 1976, he was awakened by someone knocking on his apartment door. Thinking that it was the brother of the woman with whom he lived, Farmer opened the door. Instead, an intruder forced his way into the unlighted apartment, placed a sharp object against Farmer's shoulder, and demanded "Farmer, give me the money under the bed." Farmer, who was 71 years old, attempted vainly to repel the assailant, but finally told the man that there was some money in his pants which were over a chair. The intruder then took $40 and unsuccessfully demanded additional money from Farmer's companion, Ellen Lancaster. He also pulled the mattress off the bed, at which time several envelopes in which Farmer had hidden money fell to the floor. Before the assailant could pick up these envelopes, however, there was a knock at the door of the apartment, and the intruder fled.

1. In the context of this crime, none of these violations could be considered a "lesser included offense." The first-degree burglary charge concerned entry into the dwelling of Sylvester Farmer. In addition, appellant was convicted

of armed robbery of Sylvester Farmer; assault with intent to commit robbery while armed as to Farmer's companion, Ellen Lancaster; and assault with a dangerous weapon against each of two eyewitnesses to the crime.

Frank Adams, the person who had knocked at the door, testified that he had been awakened that night by his daughter, Jewell, who said that she had heard noises like somebody falling in the apartment beneath them. Adams and his daughter, accompanied by Clarence West, a 70-year-old man who lived with them, went downstairs to the Farmer apartment, and Adams knocked on the door. Shortly thereafter, a man whom Adams did not recognize came out of the apartment with a pistol in his hand. Adams testified that the hallway was well-lighted and that he observed the intruder for two or three minutes while the man backed out of the apartment building.

Adams' daughter, Jewell, who was 11 years old, testified that she also watched as the man left the Farmer apartment. She saw the pistol and also observed that the man had a knife in his hand.

While the assailant was leaving the building, Farmer remained in his apartment and called the police. When the officers arrived, they questioned Farmer and his companion, Ellen Lancaster, but because the apartment had been dark, neither of the victims could describe the intruder. One of the officers, however, heard Frank Adams describe the person whom he had seen leaving the apartment and realized that the characterization matched a man whom he had seen entering a building a half-block away as he was responding to the robbery complaint. The officer attempted to locate this building, but he was unable to determine whether the person had gone into 317 or 319 18th Street, Northeast.

About a month later, a police detective reinterviewed Frank Adams.[2] No one had previously talked with Adams' daughter, Jewell, but at this time she revealed that on the night of the offense she had recognized the gunman as a friend of her brother who was named "Dexter" and who lived a half-block away. She then pointed out to the officer the house of the person whom she had recognized, 319 18th Street, Northeast.

Subsequently, a police detective obtained a picture which he believed to be that of the suspect and included it in a photographic array which he showed separately to Frank and Jewell Adams. Both of the witnesses chose the same photograph as someone whom they had seen in their neighborhood, but each stated that the person whom they identified had no connection with the Farmer incident. The officer later placed a picture of Dexter Brown in a photographic array which he presented separately to the witnesses, and both of them positively identified appellant as the person whom they had seen emerging from the Farmer apartment. Thereafter, Frank and Jewell Adams separately viewed a police department lineup at which they each identified appellant as the gunman, and both of them identified him at trial.

I

Appellant's initial contention on appeal is that the trial court committed reversible error in permitting the government, after the court apparently issued an order sequestering the witnesses, to reopen its direct examination of an eyewitness, Frank Adams, following consultations among (1) Adams, (2) the prosecutor, and (3) a police detective who became a subsequent government witness and testified concerning the steps taken by the police in investigating the crime. At this conference their discussion concerned the number of times the police had shown to the witnesses a photographic array in which the picture of appellant had actually appeared. The issue arose as follows.

Jewell Adams preceded her father on the witness stand. During her testimony she stated that she had been shown photographs on two different occasions. The first time she was shown a group of photographs, appellant's picture *was not* included and so she did not select anyone as the

---

2. The third person who went downstairs to investigate on the night of the intrusion into the Farmer apartment, Clarence West, was questioned by the police only on the night of the incident, at which time, according to the police officer who talked with him, "he couldn't give any description of the man."

suspect; when she was shown a second set of photographs, in which appellant's picture *was* included, she identified Dexter Brown.

On direct examination, Frank Adams agreed during his first appearance before the jury that he had seen two photographic arrays; he asserted, however, that on both occasions he identified the *same* man. He further testified that he had made a lineup identification, and he pointed out appellant in court.

Following cross-examination by defense counsel, during which the photo identification issue was *not* raised, trial adjourned for the weekend. At this time, therefore, there was a direct conflict between the two eyewitnesses, *i. e.*, the Adamses, concerning the number of times they had identified the suspect in a photographic array prior to trial.

As the prosecutor told the court when trial reconvened on Monday morning, from his previous familiarity with the case, he had been "convinced that in some way [Adams] was mistaken." Consequently, after court recessed on Friday, the prosecutor had spoken with Detective Miller, the person who had displayed the photographs. During these conversations, the prosecutor learned for the first time that during the initial photographic spread in which appellant's picture did *not* appear, both witnesses had identified a person other than appellant as someone whom they recognized from the neighborhood but who was not the suspect. Admitting that he "did not know how to resolve the situation," the government attorney then spoke to witness Adams who "again stuck to the story that he made two photographic identifications of Dexter Brown." The critical event occurred subsequently when the prosecutor "*attempted to refresh [Adams'] recollection by having Detective Miller present at the time and discuss the exact ways those identifications were made.*" [Emphasis added.]

Even after this conversation, the prosecutor believed that the witness "still exhibited a lot of confusion about these two prior identifications," and so he spoke to Adams again on Monday morning. At this time the government attorney finally realized that when the witness stated that he had identified the same man twice, he was referring in the first instance to an identification from a photographic array and in the second situation to the showing at a witness conference of a *photograph of a lineup.*

The prosecutor pointed out that since defense counsel had not probed this issue on cross-examination, the confusion could not be corrected through redirect examination. He therefore asked the court to permit the government to reopen direct examination of the witness Frank Adams. Defense counsel noted that he had no objection to the fact that the prosecuting attorney had discussed the case with the witness but, in light of the court's admonition to the witnesses that they were not to discuss the case among themselves until the trial was over, he objected to the conversation in the prosecutor's presence between Adams and Detective Miller, a potential government witness. Despite the objection, the court granted the government's request.

When witness Adams was recalled to the stand, he testified that he met with the prosecutor and Detective Miller on Friday afternoon and that he also saw the government attorney on Monday morning. During these encounters he realized that he had not understood what was meant by the prosecutor's questions as to prior photographic identifications. Frank Adams then explained that he had been shown photographs on three occasions. The first time he saw a photographic array, the suspect's picture was not included, but he showed Detective Miller "someone that looked like he could be kin to Dexter Brown"; the second time he saw a photographic array, he identified Dexter Brown as the suspect; and later, when he was shown a photograph of a lineup, he again picked the appellant. Subsequently, Detective Miller testified as a government witness to the same sequence of events.

Appellant contends that the trial court committed a clear abuse of discretion by permitting a witness to be recalled to clarify previous testimony after this witness,

Frank Adams, with the prosecutor's cooperation, had discussed his earlier testimony with another witness, Detective Miller, in violation of the court's rule on witnesses.

■ Initially, we note that the trial judge has broad discretion concerning whether a witness may be recalled to the stand after testifying, and an appellate court will review his determination only for an abuse of discretion. *In re D.S.A.*, D.C. App., 283 A.2d 829, 831 (1971). In deciding whether the judge in this case abused his discretion, it is important to review the purposes served by a court order requiring witnesses not to discuss the case among themselves. A judicial order of this nature "exercises a restraint on witnesses 'tailoring' their testimony to that of earlier witnesses"; it "aids in detecting testimony that is less than candid"; and it prevents "improper attempts to influence the testimony in light of the testimony already given." *Geders v. United States*, 425 U.S. 80, 87, 96 S.Ct. 1330, 1335, 47 L.Ed.2d 592 (1976). Because these objectives may be served, however, by remedies which are considerably less severe than the complete exclusion of a witness (*e. g.*, comment to the jury on the witness' conduct), courts will not exclude testimony merely because of the violation of the court's sequestration order unless certain "particular circumstances" exist. *Holder v. United States*, 150 U.S. 91, 92, 14 S.Ct. 10, 37 L.Ed. 1010 (1893). Generally, the violation of the court order must be so egregious that it "has somehow so discredited the witness as to render his testimony incredible as a matter of law." *Taylor v. United States*, 388 F.2d 786, 788 (9th Cir. 1967). Consequently, this jurisdiction has held that a witness' testimony will be excluded *only* where the violation of the court order "was with the connivance or knowledge of the party or his

counsel." *Jett v. Jett*, D.C.App., 221 A.2d 925, 927 (1966). *See United States v. Torbert*, 496 F.2d 154, 158 (9th Cir.), cert. denied, 419 U.S. 857, 95 S.Ct. 105, 42 L.Ed.2d 91 (1974) (exclusion permitted where a "defendant or his counsel have somehow cooperated in the violation of the order"); *Braswell v. Wainwright*, 463 F.2d 1148, 1155–57 (5th Cir. 1972); *District of Columbia v. Flagg*, 42 App.D.C. 73, 77 (1914).

■ We consider here a situation in which the prosecutor arranged a meeting between a potential government witness, Detective Miller, and Frank Adams, a witness who had already testified. Although cases in this jurisdiction which have considered this problem deal almost exclusively with connivance between witnesses and a defendant or his attorney, here it would have been within the court's discretion to have found a violation of its sequestration order by the government and to have excluded (a) any further testimony by Mr. Adams and (b) any testimony at all by the detective. Instead of excluding either or both of these witnesses, however, the trial court spread the entire matter of the prosecution's action before the jury and permitted comprehensive cross-examination of the witnesses on this issue.[3] While we recognize that the prosecutor could have presented the facts to the jury in a manner which would have avoided violating the rule on witnesses, we are not prepared to say that the way the trial court chose to deal with this matter provides grounds for reversal. *See In re D.S.A., supra*, at 831; *United States v. Manglona*, 414 F.2d 642, 644 (9th Cir. 1969). *Cf. United States v. Eastwood*, 489 F.2d 818, 821 (5th Cir. 1974).

Appellant points to two aspects of the procedure followed by the trial court which

---

**3.** The record indicates that the trial court *consciously* selected full disclosure of the incident as an alternative to exclusion of the witnesses. During discussion at the bench concerning reopening the direct examination of witness Adams, the judge asked counsel whether perhaps the consultations among Adams, the detective and the prosecutor were something that "should be aired in front of the jury, so the jury

can make up their mind and give it what weight they think is appropriate?" Although defense counsel disagreed, the court stated before granting the government request:

I can't see how your client will be prejudiced by permitting the Government to reopen for this purpose. As far as the taint is concerned, the jury can draw whatever conclusions they deem appropriate.

he urges were highly prejudicial. He contends, first, that prior to the clarification achieved by reopening the direct examination of Frank Adams, his testimony to the jury had been inconsistent with that of the other eyewitness, Jewell Adams, and that the jury could have concluded from this conflict that the witnesses (or at least one of them) were not credible. This argument is without merit. To the extent that the prosecutor detected in Frank Adams' original testimony an error concerning the number of times the witness had chosen appellant from a "photographic array," the prosecutor had a professional obligation to present a truthful version of the events to the jury. *See Frazier v. United States,* 233 F.2d 1, 2 (9th Cir. 1956); *United States v. Harris,* 368 F.Supp. 697, 715 (E.D.Pa.1973), *aff'd,* 498 F.2d 1164 (3rd Cir.), *cert. denied,* 419 U.S. 1069, 95 S.Ct. 655, 42 L.Ed.2d 665 (1974). Moreover, in this case there was extensive cross-examination concerning what transpired at the meetings and Frank Adams' confusion about what the prosecutor meant when he referred to a "photographic array." Because the Supreme Court has commented that skillful cross-examination is an effective weapon to cope even with a witness who has been improperly coached, *Geders v. United States, supra,* 425 U.S. at 89–90, 96 S.Ct. 1330, we find the extensive defense cross-examination of Adams to have been an adequate cure for any possible prejudice which might have arisen from the meeting between the witness, the detective and the prosecutor. *See In re D.S.A., supra* at 831.

In a related argument, appellant asserts that he was prejudiced because the consultation between Adams and Detective Miller improperly alerted the officer to the content of the testimony of Adams, a witness who had preceded him on the stand. We note, however, that during discussion of the issue at the bench, when it became clear that the trial court was not inclined to exclude further testimony by Frank Adams, defense counsel specifically asked that the detective also be put on the witness stand:

> I would request that Your Honor amplify your ruling and *request that the Government also put on Detective Miller, so that the jury gets a full picture.* (Emphasis added.)

Thus it is at least arguable that appellant waived his objection to the testimony of Detective Miller, and that he cannot now on appeal seek reversal of his conviction on that ground. *See Grennett v. United States,* D.C.App., 318 A.2d 589 (1974); *Hill v. United States,* D.C.App., 280 A.2d 925, 926 (1971). Furthermore, even if we were to conclude that the defendant had preserved this issue for appeal, it was within the discretion of the trial court to have exempted Detective Miller from the sequestration order. *United States v. Whiteside,* 404 F.Supp. 261, 266 (D.C.Del.1975). *See United States v. Maestas,* 523 F.2d 316, 321 (10th Cir. 1975); *United States v. Rollins,* 522 F.2d 160, 167 (2d Cir. 1975), *cert. denied,* 424 U.S. 918, 96 S.Ct. 1122, 47 L.Ed.2d 324 (1976); *United States v. Curtis,* 520 F.2d 1300, 1304 (1st Cir. 1975); *United States v. Thor,* 512 F.2d 811, 813 (5th Cir. 1975); *United States v. Pellegrino,* 470 F.2d 1205, 1208 (2d Cir. 1972), *cert. denied,* 411 U.S. 918, 93 S.Ct. 1556, 36 L.Ed.2d 310 (1973); *United States v. Mallis,* 467 F.2d 567, 568 (3d Cir. 1972).[4]

■ Appellant offers no proof that Miller actually tailored his testimony to match that which had been given by the prior witness. We note, moreover, that even if we had before us evidence that the detective had made important substantive changes in his testimony following his violation of the sequestration order, it would

4. The Second Circuit Court of Appeals indicated in *United States v. Nazzaro,* 472 F.2d 302, 313 n.12 (2d Cir. 1973), that it had been improper in that case for the court to exempt a special agent from a sequestration order where the agent's credibility was a crucial element in the government's case. *Nazzaro* is however, distinguishable from this case. There, the agent was also the major prosecution witness, and his testimony concerned the critical issue of what the defendant had said during a police interrogation. The agent had been present at the prosecution table throughout the entire trial. Moreover, *Nazzaro* was a case in which the trial judge improperly interfered with the course of the trial.

have been within the court's discretion to have refused to exclude his testimony. *United States v. Moriarty,* 497 F.2d 486, 489 (5th Cir. 1974), *discussing United States v. Suarez,* 487 F.2d 236, 237–38 (5th Cir. 1973), *cert. denied,* 415 U.S. 981, 94 S.Ct. 1572, 39 L.Ed.2d 878 (1974). Furthermore, as in the previous situation, the defense conducted extensive cross-examination of Detective Miller on this issue. For all of the foregoing reasons, we conclude that the trial court's decision to permit the government to reopen direct examination of Frank Adams, and subsequently to permit Detective Miller to testify, did not constitute an abuse of discretion.

## II

Appellant further contends that the trial court erred in permitting counsel to conduct an initial voir dire outside the jury's presence concerning the competency to testify of Jewell Adams, an 11-year-old eyewitness, and then to pursue a similar line of questioning in the presence of the jury. He objects to questions about her church attendance and the propriety of lying,[5] and argues that, since the judge had already found her to be a competent witness, this second voir dire was unnecessary and tended unfairly to enhance her credibility before it had become an issue in the case.

It is without dispute that the competency of a witness to testify is a threshold question of law which is committed to the sound discretion of the trial court. *See, e. g., Wheeler v. United States,* 159 U.S. 523, 524–25, 16 S.Ct. 93, 40 L.Ed. 244 (1895); *Doran v. United States,* 92 U.S.App.D.C. 305, 307, 205 F.2d 717, 719, *cert. denied,* 346 U.S. 828, 74 S.Ct. 49, 98 L.Ed. 352 (1953). This court has previously stated, however, that an original voir dire examination may be conducted in the presence of a jury because such questioning assists the jurors in evaluating independently the child's qualifications as a witness. *Johnson v. United States,* D.C.App., 364 A.2d 1198, 1200 n.1, 1202 n.12 (1976). We see no reason to depart from the *Johnson* rationale in this case. The jury had a duty to assess the credibility of the witness and the weight to be given to her testimony. Because she was a child witness, the voir dire questions may well have aided the jury in this determination. We hold therefore that the trial court did not commit reversible error in permitting this brief line of questions on this issue.

---

5. The following exchange between Jewell Adams and the prosecutor occurred before the jury:

Q. Don't be nervous. How old are you, Jewell?
A. Eleven.
Q. Do you go to school?
A. Yes.
Q. What school do you go to?
A. Gibbs Elementary.
Q. How far is Gibbs Elementary from your house?
A. About two blocks.
Q. Do you walk to school?
A. Uh-huh.
Q. What grade are you in in school?
A. Fifth.
Q. Do you know what your teacher's name is?
A. Miss Collins.
Q. Do you know what a lie is, Jewell?
A. Uh-huh.
Q. Do you know that it's wrong to. lie?
A. Yes.
    *    *    *    *    *    *
Q. You know that it's wrong to lie?
A. Uh-huh.

Q. Do you know what happens if you tell a lie and you're sworn to tell the truth?
A. I can get put in jail.
Q. Do you go to church, Jewell?
A. Yes.
Q. Did you ever learn in church whether it's wrong to lie?
A. Uh-huh.
Q. What have you learned? Is it wrong to lie according to the teachings of your church?
A. Yes.
Q. I'm just going to give you a few examples. I want you to tell me whether it's a lie or the truth. If I were to tell you the lights were off in this room right now, would that be a lie or the truth?
A. A lie.
Q. If I told you that my name is Jimmy Carter, is that a lie or the truth?
A. A lie.
Q. Why is it a lie?
A. Cause Jimmy Carter's president.
Q. If I told you today was Friday, would that be a lie or the truth?
A. The truth.
Q. Why is that the truth?
A. Today is Friday.

## III

Appellant's final contention is that the trial court abused its discretion by refusing to give a missing witness instruction with respect to Clarence West, a third eyewitness to the escape of the suspect from the Farmer apartment, who was not called to testify by the government and whose existence was not brought to appellant's attention until trial.[6]

■ The posture of this case on appeal is somewhat unusual. The principle is well established that if "a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable." *Graves v. United States,* 150 U.S. 118, 121, 14 S.Ct. 40, 41, 37 L.Ed. 1021 (1893). Where these dual conditions are met, *i. e.,* when a witness is peculiarly available to the party who fails to produce him, and the testimony of that witness could "elucidate the transaction," a jury may be instructed concerning the resulting inference. The trial court here denied the requested "missing witness instruction" on the ground that the witness had not been peculiarly available to the government because appellant could have subpoenaed him.[7] During discussion at the bench, the prosecutor agreed with this proposition, but he volunteered:

> I could have made him available. I just wanted to save an old man the time and trouble of coming down here when he has a lot of trouble getting around. . . .
> I'll be more than glad to have him brought down here right now and have [defense counsel] put him on the witness

stand if [defense counsel] really feels that he needs him in his case.

Defense counsel interjected no comment, and the trial court then denied the missing witness instruction. The court emphasized however, that its ruling "doesn't preclude counsel from commenting on his [the witness'] absence here." [8]

■ On appeal, the government has conceded that it will not "contest the fact that Mr. West was peculiarly available to the government," and we agree with both parties that the trial court based its ruling on an incorrect premise. While we agree with the trial court that the use of a subpoena would in many circumstances have been a viable means by which appellant could have acquired the testimony of the witness, *see Brown v. United States,* 134 U.S.App.D.C. 269, 271, 414 F.2d 1165, 1167 (1969); *Morton v. United States,* 79 U.S.App.D.C. 329, 332, 147 F.2d 28, 31, *cert. denied,* 324 U.S. 875, 65 S.Ct. 1015, 89 L.Ed. 1428 (1945). *Cf. Blair v. District of Columbia,* D.C.App., 200 A.2d 93, 96 (1964), nevertheless, the defense should not have been required to have used a subpoena to acquire the testimony of the witness in the case where it discovered the identity and location of the potential witness only during the course of the trial. *See United States v. Stevenson,* 138 U.S. App.D.C. 10, 13, 424 F.2d 923, 926 (1970). Given the particular availability of the witness Clarence West to the government, the trial court thus could not justify a refusal to give a missing witness instruction on the ground which it used.

■ A missing witness instruction should not be given, however, unless—in addition to being peculiarly available to one

---

6. The existence of this witness was first revealed during testimony by a police officer who investigated the incident on the night of the robbery. He described his conversations with the victims and Frank Adams and then he was asked:

> Q. Did you speak to anyone else that night?
> A. There was another individual that I spoke with that lives in the apartment upstairs with Mr. Frank Adams, but he couldn't give any description of the man.

Later Frank Adams testified on direct examination that "the old fellow, Mr. West, Clarence I.

West," whom Adams described as 70 years old, had come downstairs with him the night of the incident.

7. It is error to give the "missing witness" instruction where the witness is equally available to both sides." *Egan v. United States,* 52 App. D.C. 384, 396, 287 F. 958, 970 (1923).

8. Because closing arguments of counsel have not been made part of the record on appeal, we do not know whether defense counsel actually availed himself of this opportunity.

party—the absent witness also is able to "elucidate the transaction." *Graves v. United States, supra,* 150 U.S. at 121, 14 S.Ct. at 40. In this case Clarence West had been unable to give a description of the person whom he had seen leaving the apartment on the night of the robbery. Although arguably his mere presence at the scene placed him in a position to "elucidate the transaction," *see Hale v. United States,* D.C.App., 361 A.2d 212, 216 (1976), a close reading of the record indicates that appellant agreed with the prosecution that his absence was not harmful to the defense. During discussion of the instruction at the bench the trial court asked appellant's counsel, "Did you really want him [Mr. West]?" and defense counsel replied:

> I have no obligation whatsoever according to the Constitution of the United States and the jury rules to *prove the Government's case.* I don't have to call any witness. I could have rested at that point [at the close of the government's case]. [Emphasis added.]

A short time later the prosecutor expressed a willingness "to have him [the witness] brought down here right now . . . .", to which defense counsel made no response. In this context, we are not convinced that appellant himself considered the absent witness to be someone who could "elucidate the transaction."[9] Consequently, in this case we hold that the dual requirements of *Graves* were not met, and the missing witness instruction should not have been given.

■ Furthermore, even if Clarence West had been able to elucidate the transaction and had been peculiarly available to

the government, after considering all of the circumstances, we are able to conclude that the failure to give the missing witness instruction did not result in prejudice to the defendant. *See Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *Conyers v. United States,* D.C. App., 309 A.2d 309, 313 (1973). When the issue was raised at trial, the prosecutor expressed a willingness to make the witness available, and we recognize that the failure to give a missing witness instruction is not error "in the absence of a showing that evidence material to appellant's defense was suppressed." *Morton v. United States,* 79 U.S.App.D.C. 329, 332, 147 F.2d 28, 31, *cert. denied,* 324 U.S. 875, 65 S.Ct. 1015, 89 L.Ed. 1428 (1945). Moreover, although the judge refused to give the requested instruction, he expressly indicated that defense counsel could comment on the absence of the witness.[10] The court by its ruling thus was not foreclosing consideration by the jury of the government's failure to produce Mr. West. In addition, the government had presented a strong case, for both Frank and Jewell Adams had been able to identify appellant on numerous occasions and gave uncontradicted testimony that appellant was the assailant. Consequently, we cannot say that the failure of the court to give the missing witness instruction was prejudicial error.

*Affirmed.*

---

**9.** Although the witness had been unable to describe the intruder on the night of the event, it is arguable that he would have been able subsequently to make an identification of the person either from a photographic array or in court during trial; if this were true, however, his testimony in this case would have been merely cumulative. *See Anderson v. United States,* D.C.App., 352 A.2d 392, 394 (1976). Arguably, too, if West had been *unable* to identify the robber, this fact could have weighed against the other eyewitnesses in the minds of the jurors. However, given the fact that defense counsel apparently believed that calling the witness would help "to prove the Government's case," we cannot entertain these alternatives seriously since the government is not required

to call a witness whom it deems unnecessary to its case. *Richards v. United States,* 107 U.S. App.D.C. 197, 200, 275 F.2d 655, 658, *cert. denied,* 363 U.S. 815, 80 S.Ct. 1253, 4 L.Ed.2d 1155 (1960).

**10.** Even though a jury instruction only permits and does not require an adverse inference concerning a party's failure to produce a witness, we recognize, of course, that argument of counsel would have less impact on the jury than would an instruction from the bench which carries with it the weight of law. *See Burgess v. United States,* 142 U.S.App.D.C. 198, 207, 440 F.2d 226, 235 (1970).