**Allen MINOR, Petitioner,**

v.

**David HARRIS, as Superintendent, of Taconic Correctional Facility, Respondent.**

**No. 81 Civ. 3919(ADS).**

United States District Court, S.D. New York.

Feb. 4, 1983.

Susan C. Thon, William E. Hellerstein, The Legal Aid Society, New York City, for petitioner.

Robert Abrams, Atty. Gen., State of New York, New York City, for respondent; Paul Jawin, Deputy Asst. Atty. Gen., New York City, of counsel.

## OPINION AND ORDER

SOFAER, District Judge:

Petitioner, who has served over five years of an indeterminate fifteen year prison sentence for robbery in the second degree, seeks habeas corpus relief pursuant to 28 U.S.C. § 2254 (1976). He was convicted on January 5, 1978, in New York Supreme Court, Queens County, of participating, with three other youths, in the robbery of Mr. Harry Landsberg on October 18, 1976. The thieves took Mr. Landsberg's wallet, containing ten dollars, but left him otherwise unharmed. Petitioner appealed his conviction to the Appellate Division of the Supreme Court, Second Department, arguing, *inter alia,* that the conduct of his trial judge, Justice Aaron F. Goldstein, throughout the trial and in instructing the jury, denied him his constitutional right to a fair trial. On February 11, 1980, the Appellate Division affirmed the conviction without opinion. *People v. Minor,* 74 A.D.2d 740, 424 N.Y.S.2d 806 (2d Dep't 1980). The New York Court of Appeals denied him leave to appeal on March 21, 1980.

Petitioner argues that "[t]he entire trial was infected by Justice Goldstein's hostility toward petitioner, his counsel, and the defense case." Pl.Mem. at 12. As he did in appealing within the state system, petitioner divides his claims into two groups: Justice Goldstein's interventions during the evidentiary phase of the trial, and his allegedly prejudicial and unconstitutional jury instructions.[1] Petitioner has "exhausted the remedies available in the courts of the State," 28 U.S.C. § 2254(b) (1976), with respect to his claims; he has fairly presented to an appropriate state court the same factual complaints urged here, including in his state court briefs reference to the specific parts of the federal constitution on which he relies—the right to a fair trial and the

right to confront witnesses; and he has appealed on those grounds to the highest state court. *Klein v. Harris,* 667 F.2d 274, 282 (2d Cir.1981). Petitioner is not entitled to relief, however, because procedural defaults preclude review of some of his claims, and because in any event he has failed to establish a basis for issuing the writ.

## I.

Respondent contends that petitioner has forfeited many of his claims—all of his objections to the court's charge and some of his objections to events that occurred earlier in the trial—by failing to object to them during the trial. In New York, as in many jurisdictions, failure to object timely at trial to perceived errors in trial procedure ordinarily precludes appellate review of those alleged errors. N.Y. Crim.Proc.Law § 470.05(2) (McKinney's 1971); *see People v. Thomas,* 50 N.Y.2d 467, 471, 407 N.E.2d 430, 432, 429 N.Y.S.2d 584, 586 (1982). Principles of comity mandate that federal courts respect state rules that require contemporaneous objections to preserve claims of error. *See Wainwright v. Sykes,* 433 U.S. 72, 88–91, 97 S.Ct. 2497, 2507–2508, 53 L.Ed.2d 594 (1977). Therefore, where the state appellate courts have declined to review the merits of a claim of error because of a procedural default, a federal court reviewing a § 2254 habeas petition must do the same unless the petitioner can show "cause" for the default and "actual prejudice" resulting from the error. *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *Wainwright,* 433 U.S. at 87, 97 S.Ct. at 2506.

The fact that a default occurred in state court, however, does not necessarily establish that the state courts relied on the default in rejecting a claim. If the state courts choose to reach the merits, despite the availability of a procedural ground for denying a claim, the federal courts must likewise disregard the default and reach the

---

1. Petitioner also claims that the trial judge made prejudicial remarks during the opening statements. This claim does not warrant separate treatment.

merits. There is "no warrant ... for guarding state procedural rules more vigilantly than the State itself does." *Washington v. Harris,* 650 F.2d 447, 452 (2d Cir. 1981); *see County Court v. Allen,* 442 U.S. 140, 147–54, 99 S.Ct. 2213, 2219–23, 60 L.Ed.2d 777 (1979).

These principles failed until recently to provide sufficient guidance for cases in which a default clearly occurred but the state appellate court denied relief without indicating whether it was ruling on the merits or on the default. In this case, as in many others, both the Appellate Division's affirmance and the Court of Appeal's denial of leave to appeal were without opinion. *See, e.g., Washington v. Harris, supra,* 650 F.2d at 451; *Taylor v. Harris,* 640 F.2d 1 (2d Cir.), *cert. denied,* 452 U.S. 942, 101 S.Ct. 3089, 69 L.Ed.2d 958 (1981); *Wright v. Bombard,* 638 F.2d 457 (2d Cir.1980), *cert. denied,* 450 U.S. 935, 101 S.Ct. 1400, 61 L.Ed.2d 370 (1981); *Alburquerque v. Bara,* 628 F.2d 767 (2d Cir.1980); *Callahan v. LeFevre,* 605 F.2d 70, 73 n. 6 (2d Cir.1979). In *Martinez v. Harris,* 675 F.2d 51 (2d Cir. 1982), the Second Circuit, noting considerable confusion in interpretating state court silence in federal habeas cases, resolved to "state the law on the issue, as we understand it, as it has developed in this circuit." *Id.* at 54. *Martinez* established that a District Court must base its interpretation of silence by the Appellate Division on whether the state raised the procedural default on appeal; when the prosecutor has argued only the merits of a claim, an affirmance without opinion will be deemed to have reached the merits; and when the prosecutor relied on the default, even if argued in the alternative, relying also on the merits, an affirmance without opinion must be presumed to be based on the procedural ground. An affirmance under the latter circumstances creates an adequate and independent state ground that precludes federal review absent a showing of cause and actual prejudice. *Id.; see* Hill, *The Forfeiture of Constitutional Rights in Criminal Cases,* 78 Colum.L.Rev. 1050, 1082–88 (1978).

The Court relied on practical considerations to support its ruling. It recognized that the State cannot easily predict when the Appellate Division will invoke its discretionary interest-of-justice jurisdiction and therefore sought not to place the state at risk when it argues the merits as well as a procedural default by a restrictive interpretation of appellate court silence. It reasoned:

> Arguing in the alternative is a well-accepted practice .... It therefore makes no sense for us to hold that when a state prosecutor acts as a prudent advocate, he waives any of the alternative grounds that he asserts. Furthermore, we do not believe that the Appellate Division's silence evinces an intent to overlook the procedural error. The interest-of-justice jurisdiction under § 470.15 is not invoked routinely. See, e.g., *People v. Robinson,* 36 N.Y.2d 224, 228–29, 367 N.Y.S.2d 208, 326 N.E.2d 784 (1975). Therefore, we feel justified in assuming that the Appellate Division does not exercise its discretion under the section and decide a case solely on the merits of a claim, unless it says so.

675 F.2d at 54 (footnote omitted).

The assumption required by *Martinez* marks a necessary refinement in this Circuit's rules governing procedural default. Although the Court stated that it was merely clarifying the law, prior cases articulated less manageable rules of construction. In *Klein v. Harris,* 667 F.2d 274 (2d Cir.1981), the Court held that, before a federal court denies habeas review under *Wainwright v. Sykes,* it must appear "that the state court *actually relied* upon a procedural default ...." *Id.* at 285 (emphasis in original). It counselled that a District Court, in deciding whether the state court actually relied on a procedural bar, proceed "on a case-by-case basis, upon a consideration of all the relevant indicia." *Id.* at 285. In other cases the Court also seemed to look to more varied factors and make *ad hoc*

decisions in interpreting state court silence.[2] *See, e.g., Washington v. Harris,* 650 F.2d 447, 451–52 (2d Cir.1981); *Gruttola v. Hammock,* 639 F.2d 922, 929 (2d Cir.1981); *Callahan v. LeFevre,* 605 F.2d 70, 73–74 (2d Cir.1979). Moreover, while *Martinez* shifted from these *ad hoc* evaluations in an opinion that still spoke in terms of "shoulds" and "presumptions", arguably leaving some room for variance from its rule, *see, e.g.,* 675 F.2d at 54 n. 6, subsequent Second Circuit opinions leave no doubt as to the appropriateness of its single factor approach. "Under *Martinez v. Harris,*" the Second Circuit recently stated, "a state appellate court's silence [after the state has argued in the alternative] *requires* a federal habeas corpus court *to conclude* that the petitioner's claim was rejected by the state appellate court on state law grounds." *Johnson v. Harris,* 682 F.2d 49, 51 (2d Cir.1982) (emphasis added); *see also Gulliver v. Dalsheim,* 687 F.2d 655, 659 (2d Cir.1982).

▮ Petitioner has therefore waived those constitutional claims that he failed to raise at trial and that the state contested on procedural grounds on appeal. In particular, petitioner failed to challenge at trial, constitutionally or otherwise, the jury charges delivered by Justice Goldstein. Habeas review of these charges is therefore precluded, although several of petitioner's claims seem meritorious, given the Appellate Division's reversals of many other convictions before Justice Goldstein involving similar charges. *See, e.g., People v.*

*Branch,* 83 A.D.2d 855, 441 N.Y.S.2d 737 (2d Cir.1981) (defendant deprived of fair trial by charge that among other things the "question of punishment rests on the shoulders of this Judge. And you can be sure that my shoulders are big enough and broad enough to carry that responsibility."); *People v. Abreu,* 74 A.D.2d 876, 426 N.Y.S.2d 33 (2d Dep't 1980) (error to tell jury that supplemental reasonable doubt charge was given at defendant's request and to imply to jury that it is their duty to convict); *People v. Iskander,* 74 A.D.2d 880, 426 N.Y.S.2d 24 (2d Dep't 1980) (fair trial denied where judge belabored fact that defendant had motive to lie, suggested criminality of defendant on stand and usurped the role of prosecutor and defense by persistent questioning of witness); *People v. Davis,* 73 A.D.2d 693, 423 N.Y.S.2d 229 (2d Dep't 1979) (deprivation of fair trial to call defendant "perpetrator" and complainant "victim," and to suggest to jury that defendant was guilty); *People v. Vizcaino,* 71 A.D.2d 934, 419 N.Y.S.2d 715 (1979) (fair trial denied where judge, among other things, "laced" charge with comments tending to convey to jury court's disbelief of defendant's testimony); *People v. Byrdsong,* 58 A.D.2d 877, 396 N.Y.S.2d 485 (2d Dep't 1977) (deprivation of fair trial to tell jury that complainant either told truth or lied where issue was identity, and to suggest that to acquit jury would have to disbelieve complainant and two police officers). Petitioner has offered no explanation that would establish cause and excuse this default under *Wainwright v. Sykes,* 433

**2.** The lack of force with which the state argued the default on appeal in state court would become relevant under this more flexible standard. The state cited to petitioner's failure to object to the jury instructions in but three brief sentences after having engaged in an exhaustive argument on the merits. Respondent's Brief Before Appellate Division at 24. The State failed to mention the default in the Table of Contents, the section heading, the introduction, *id.* at 22–23, or the conclusion, *id.* at 24, of its discussion of these instructions. Similarly, the State's brief mentioned petitioner's failure to object to the other alleged errors in but three sentences of a seven and one-half page argument. *Id.* at 18–19 and omitted to point to it in the Table of Contents, the heading and intro-

duction, *id.* at 14–15, or the conclusion, id. at 21. In this section, in fact, the state cited the default primarily as evidence of an asserted lack of prejudice which could easily be construed by the Appellate Division as argument on the merits. *Id.* at 20. This was far from a coherent, let alone full-dressed, argument in the alternative, and may indicate that the State expected the Appellate Division to decide the case on its merits and that the Court did so. *See Washington v. Harris,* 650 F.2d 447, 451–52 (2d Cir.1981). Under the multi-factored approach suggested by *Klein* and *Gruttola* these facts would be relevant to decide whether the Appellate Division "actually relied" on the default.

U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). His assertion that he was represented by ineffective counsel does not meet the rigid standards for establishing cause. *See Dudley v. Dalsheim,* 686 F.2d 110, 112 (2d Cir. 1982).

■ Petitioner's standing to raise constitutional claims directed at Justice Goldstein's trial intrusions requires closer scrutiny; if objections by trial counsel satisfied New York's contemporaneous objection statute, then standing is preserved and *Martinez* has no bearing. Section 470.05(2) provides:

> For purposes of appeal, a question of law with respect to a ruling or instruction of a criminal court during a trial or proceeding is presented when a protest thereto was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same. Such protest need not be in the form of an "exception" but is sufficient if the party made his position with respect to the ruling or instruction known to the court. In addition, a party who without success has either expressly or impliedly sought or requested a particular ruling or instruction, is deemed to have thereby protested the court's ultimate disposition of the matter or failure to rule or instruct accordingly sufficiently to raise a question of law with respect to such disposition or failure regardless of whether any actual protest thereto was registered.

N.Y.Crim.Proc.Law § 470.05(2) (McKinney 1971). Petitioner's counsel clearly objected to much of the conduct claimed to be prejudicial in this petition. Those claims are therefore preserved. Although clear-cut objections were not made to other aspects of Justice Goldstein's trial conduct, trial counsel's objections were sufficient, under the Second Circuit's treatment of the statute, to have focused the trial court's attention to the problem and thereby to have preserved the claims for review.

Much of Justice Goldstein's conduct to which the State claims petitioner failed to object involved neither rulings nor instructions, but rather allegedly prejudicial and improper interjections and questions to witnesses. See Petitioner's Mem. of Law at 17–21, 24, 33–36. Other aspects of the judge's conduct intruded on defense counsel's examination of witnesses by, for example, sustaining certain "objections" to petitioner's counsel's questions without an objection actually having been made by the prosecutor. Petitioner preserved his objections to this conduct as a matter of law under the statute. In those instances where counsel did not specifically object to the court's actions—for example, when Justice Goldstein altered the course of or objected to counsel's cross-examinations— counsel's adverse position was so well "known to the court" as to telegraph his objections "implicitly." This satisfied § 470.05(2) which requires only that the party make the court aware of its position and does not demand a particular form of protest. As the Supreme Court noted in *County Court v. Allen:*

> New York's cautious contemporaneous-objection policy is ... carefully limited by several statutory qualifications ..., the form of the 'protest' is not controlling so long as its substance is clear .．., such protests may be made 'expressly or impliedly' ..., [and] once a protest is made, it need not be repeated at each subsequent disposition of the matter.

442 U.S. 140, 150 n. 8, 99 S.Ct. 2213, 2221 n. 8, 60 L.Ed.2d 777 (1979) (citations omitted).

The Second Circuit considered the adequacy of contemporaneous objections in *Alburquerque v. Bara,* 628 F.2d 767 (1980). There, the District Court concluded that petitioner's written "general" objection to the jury selection procedures did not provide the state with sufficient factual support to give proper notice of a constitutional challenge to the New York statute for empaneling juries. *Id.* at 771–72. The Second Circuit reversed. It held that the New York statute and the policies underlying *Wainwright v. Sykes* demanded only compliance sufficient "to alert the state to the challenge so as to enable it to respond

meaningfully, ... and further to prevent the necessity of a second trial with its attendant logistical difficulties." *Id.* at 773 (citations omitted). Petitioner Minor's attorney similarly telegraphed his objections, either implicitly under the attendant circumstances, or expressly, with sufficient concreteness to put the State on notice that petitioner was claiming, or would be led to claim, that he was deprived of a fair trial. As in *Alburquerque,* "[w]e express no view on what effect a clear and unambiguous state court finding of noncompliance would have upon us; it suffices for present purposes to observe that no reasoned, factually substantiated opinion has been rendered by the state courts holding that [Minor] did not meet the procedural requirements for challenging the" trial court's behavior at trial.[3] *Id.* at 772. Petitioner therefore sufficiently preserved his objections to Justice Goldstein's trial conduct.

## II.

■ Petitioner bears a heavy burden of persuasion in his attempt to show that a state court denied his right to a fair trial. A federal habeas court's reviewing power is "the narrow one of due process, and not the broad power that [it] would possess in regard to [its] own trial court." *Donnelly v. DeChristoforo,* 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974); *see also Davis v. Craven,* 485 F.2d 1138, 1140 (9th Cir.1973) (*en banc*). "Federal habeas challenges to state convictions entail greater finality problems and special comity concerns .... [T]he burden of justifying federal habeas relief for state prisoners is 'greater than the showing required to establish plain error on direct appeal.'" *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 1573, 71 L.Ed.2d 783 (1982) (quoting *Henderson v. Kibbe,* 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977). Consequently, petitioner must demonstrate not merely that the judge's conduct was "unde-

sireable" or even "universally condemned", but he must show that it "violated some right guaranteed to the defendant by the Fourteenth Amendment." *Cupp v. Naughten,* 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). "[N]ot every trial error or infirmity which might call for application of supervisory powers" will satisfy this burden, but only those that constitute a "failure to observe that fundamental fairness essential to the very concept of justice." *Donnelly,* 416 U.S. at 642, 94 S.Ct. at 1871 (quoting *Lisenba v. California,* 314 U.S. 219, 236, 62 S.Ct. 280, 289, 86 L.Ed. 166 (1941)). Finally, a habeas petitioner's burden increases where he claims that the entire proceeding was infected by a persistent harmful pattern and cannot point to a specific provision of the Bill of Rights, such as the right to counsel, for support. *Donnelly,* 416 U.S. at 643, 94 S.Ct. at 1871.

■ Still, a claim that judicial conduct at various stages in the trial "combined to deny the 'fair trial in a fair tribunal' that is 'a basic requirement of due process,'" "is well within the mainstream of due process adjudication," and therefore well within habeas jurisdiction. *Johnson v. Metz,* 609 F.2d 1052, 1057 (2d Cir.1979) (Newman, J., concurring) (quoting *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955)). In the extraordinary instance that a state judge's conduct denies petitioner his right to a fair trial, a federal court has no choice but to grant the writ, absent a finding of harmless error.

■ Claims that defects in the trial process precluded a fair trial pose difficult problems for constitutional resolution. They require the Court to scrutinize the entire trial to determine whether the resulting conviction violated due process. *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). And because, [t]here is simply no handy tool with which to gauge a claim that a judge's conduct

---

**3.** New York courts have stated that "[a]s a general rule points which were not raised at trial may not be considered for the first time on appeal." *People v. Thomas,* 50 N.Y.2d 470, 471, 429 N.Y.S.2d 584, 586, 407 N.E.2d 430, 432

(1980). But no case explicitly considering whether conduct that is neither a ruling nor an objection is embraced by § 470.05(2) has been called to the Court's attention.

... so severely prejudiced the defense as to make a fair trial impossible, ... [the court must give] close scrutiny to each tile in the mosaic of the trial [to] determine whether instances of improper behavior or bias, when considered individually or taken together as a whole, may have reached that point ....

*United States v. Nazzaro,* 472 F.2d 302, 304 (2d Cir.1973); *see also Donnelly,* 416 U.S. at 645, 94 S.Ct. at 1872; *Cupp,* 414 U.S. at 147, 94 S.Ct. at 400. Therefore, the facts adduced at trial will supply the context by which to measure the impact of Justice Goldstein's allegedly improper conduct and determine whether it amounts to a due process violation.

Three witnesses testified for the prosecution. The primary factual issue at trial was the identification of petitioner. The complainant, Mr. Harry Landsberg, testified that on October 18, 1976, at approximately 9:45 p.m. he was approached by two tall and two short, male, black youths, on 84th Street between 151st and 153rd Avenues in Queens. One short youth "danced" in front of him, apparently holding something in his hand. The youths then grabbed Mr. Landsberg, pushing him off the sidewalk into an adjoining parking lot. They demanded his wallet, and he complied. The short youth placed an object, which Mr. Landsberg did not see clearly but "felt" to be a gun, to his temple. Tr. 21. The youths demanded his watch and raincoat, but before Mr. Landsberg could comply a "sound" startled them and they fled. Three of them ran together but one tall youth ran straight ahead to a fence bounding the parking lot, and struggled over it. Mr. Landsberg testified that all four youths were wearing dark jackets.

At trial, Mr. Landsberg could not positively identify petitioner as one of the youths, saying only that he "would fit the description" and "[l]ooks like one of the tall ones." Tr. 24. On cross-examination, Mr. Landsberg admitted that three days after the robbery, in a preliminary hearing held in Criminal Court, he had stated that the defendant had not been a participant. Tr. 27.

Two brothers, Robert and Paul O'Brien, presented the strongest evidence against petitioner. On the night in question they and their brother John were watching television in the home of their cousin, Mr. Falcone, who lived in an apartment on that block of 84th Street. During a commercial break, Robert went to the window and saw a white Maverick stop at the corner of 151st Avenue and 84th Street; he then saw four black youths get out. Saying "come here and take a look at this," Tr. 232, he summoned Paul to the window. The O'Briens testified that they watched the four youths jog toward a man they later learned was Mr. Landsberg. Tr. 119–20; 247–48. Paul testified that a fifth youth, a black female, remained in the car as driver. They testified that, together with Mr. Falcone and their brother John, they ran downstairs to the street. Mr. Falcone and John O'Brien went to get their automobiles while Robert and Paul ran toward the parking lot. Robert entered it from 84th Street. Paul circled around a building and entered from an alley. As he entered the lot Robert shouted "Now." The youths hesitated for a moment, then fled.

Robert testified that the youth that left the parking lot by scaling a fence was the defendant. He did this on the basis of what he termed "a split second" view of the youth's face from a distance of 12 to 18 feet. Tr. 127, 137. Paul also identified the petitioner as the tall youth that scaled the fence. His identification was based on seeing only the left side of the youth's face— "the side of his mouth, his cheek, part of his nose"—from a distance of 60 feet. Tr. 256–58.

A chase ensued. The O'Briens lost sight of the youth identified as petitioner, but saw him again, several minutes later, on another block, attempting to get into the white Maverick. This time, they saw him from behind, identifying him by his height and his clothing, which included a light green, hooded parka. According to the O'Briens, Mr. Falcone prevented the youth from entering the Maverick by driving his own car so close to it that the door could

not open. The youth then fled again; the O'Briens pursued on foot, but soon lost sight of him. Some time later, they heard a rustling in some bushes, and ordered the youth to come out. Robert was armed with a tire iron. The youth emerged, asked why they were chasing him, and said that he had not done anything wrong. Then he fled. The O'Briens once more lost sight of him and did not see him again until he was in police custody some time later.

The defense called Police Officer Richard Quinn as a witness. Officer Quinn testified that he had responded to a radio bulletin of a disorderly man at 86–06 155th Avenue at 10:10 p.m. on the night in question. The bulletin reported calls for help and banging on doors at that address. When he arrived Officer Quinn found petitioner already in the custody of other policemen. According to Officer Quinn petitioner said that he had been put out of a car in the neighborhood, and had then been attacked and chased by white youths. On the basis of the O'Briens' statements, Officer Quinn arrested petitioner for robbery.

Petitioner testified that on October 18, 1976, he and three male companions set out from his home in Brooklyn in a brown Buick to visit a girlfriend of one of his companions in Queens. After dropping off one companion in Brooklyn, and finding out that the girl was not home, they began to quarrel. Petitioner testified that as a result of the quarrel he was put out of the car in an unfamiliar area of Queens. Tr. 319. As he began to walk in search of a subway stop, he heard racial epithets shouted at him by a group of white youths. Two of them were carrying tire irons, and a third had a large metal chain. Petitioner ran and eventually hid behind a bush. When the white youths discovered him he emerged, asking why they were chasing him. They threatened him and he ran. According to petitioner, he escaped by jumping on the back of a passing car, but was forced off it after going a short distance. He testified that, as he ran, one car tried to cut him off and collided with him. He rolled across the hood and kept running, finally taking refuge in a building. He knocked on doors,

asking the inhabitants to summon an ambulance and the police. He walked out of the building when a police car stopped in front of the house. He was then arrested and identified as a robber by Paul O'Brien. Although he could not recall for certain what sort of jacket he was wearing that evening, he testified that he had never owned a green parka. Officer Quinn was recalled as a rebuttal witness by the People. He testified that petitioner was wearing a green parka at the time of his arrest. Tr. 387.

The People's case therefore rested largely on discrediting petitioner's version of the events in question, and on the strength of the eyewitness identifications of petitioner by the O'Brien brothers. Petitioner admitted to having run from the O'Briens, having hidden behind a bush, having thereafter run away again, and having later been arrested. The identifications by the O'Briens in the parking lot were particularly important, because of the complainant's inability to identify petitioner positively at trial and because of petitioner's earlier statement that he had not been present at the robbery.

■ Petitioner complains that Justice Goldstein's excessive interventions obstructed defense counsel's ability to cross-examine witnesses, telegraphed to the jury his belief of the testimony of prosecution witnesses and disbelief of petitioner, clearly suggested his belief that petitioner was guilty, and suggested to the jury at several points that defense counsel was seeking to prevent the jury from hearing the truth. In the interest of brevity, all of the examples set forth by petitioner cannot be reviewed. A few examples, however, will suffice to demonstrate that, although petitioner may exaggerate the nature and probable impact of the intrusions, the judge's conduct impaired his right to a fair trial.

■ The State does not dispute the fact that Justice Goldstein frequently intervened in the trial. But it points out, correctly, that "[a] judge is more than a moderator; he is charged to see that the law is properly administered, and it is a duty which he cannot discharge by remaining

inert." *United States v. Marzano,* 149 F.2d 923, 925 (2d Cir.1945); *see United States v. DeSisto,* 289 F.2d 833, 834 (2d Cir.1961); *United States v. Brandt,* 196 F.2d 653, 655 (2d Cir.1952). Equally fundamental, however, is the precept that the judge "must not . . . usurp the functions either of the jury or of the representatives of the parties and must take care not to give the jury an impression of partisanship on either side." *United States v. DeSisto,* 289 F.2d at 834. As Judge Learned Hand stated:

> Despite every allowance [the judge] must not take on the role of a partisan; he must not enter the lists; he must not by his ardor induce the jury to join in a hue and cry against the accused. Prosecution and judgment are two quite separate functions in the administration of justice; they must not merge.

*United States v. Marzano,* 149 F.2d at 926. If the judge's interventions become so great that they intrude on the jury's duty to evaluate impartially the evidence, or have the effect of shifting the burden of proof, they may rise to the level of a due process violation and justify the issuance of a writ.

Many of Justice Goldstein's interjections occurred "only 'where [it was] necessary to clarify testimony and assist the jury in understanding the evidence.'" *United States v. Nazzaro,* 472 F.2d at 307 (quoting *United States v. DeSisto,* 289 F.2d at 834). Some of the questions posed by defense counsel while cross-examining witnesses were confusing and, at times, repetitious.

But Justice Goldstein frequently went much further. In so doing, he made apparent his contrasting attitudes toward prosecution witnesses and petitioner. For example, when Robert and Paul O'Brien took the stand, the court suggested that each "sit back . . . relax," as they testified. Tr. 117, 219. At points where prosecution witnesses had some difficulty, the judge was quick to make supportive remarks. During cross-examination of the complainant, for example, after Mr. Landsberg admitted he did not know which direction his assailants had fled, the judge said: "Just relax. Come here and sit down and relax. . . . You're a victim. We appreciate your—sit back and relax. The jury will have to decide this case." Tr. 86.[4] When Landsberg struggled to depict on a blackboard the area where he was robbed, the judge said:

> He's a victim of a crime who came here to describe as best he could. [The jury] can realize if they were in his place they may be could not do so well.

Tr. 52. In addition to calming the witness, this remark sought to establish empathy between the complainant and the jury. At several other points during the testimony of the prosecution's witnesses, the judge stated or implied that they were telling the truth and that defense counsel, by objecting or attempting to require that they be responsive to the questions he asked on cross-examination, was trying to prevent the jury from hearing it.[5]

---

**4.** As Robert O'Brien testified on direct, after sustaining several defense objections to conclusory testimony, the judge told him to "[s]it back now. You're in a courtroom. I realize you're not a lawyer." Tr. 122. Later, Robert O'Brien denied making the statement to his brothers that they had "company in the neighborhood" when he saw the four black youths emerge from the Maverick. As defense counsel began to impeach that testimony with a prior inconsistent statement, Justice Goldstein interjected to tell O'Brien to "[r]elax. Sit back." Tr. 142. After O'Brien admitted to testifying previously that he made that remark, the Court interjected, demanding to know if counsel thought the prior testimony inconsistent and then telling him that his opinion was irrelevant.

**5.** After instructing defense counsel not to ask leading questions while cross-examining the complainant, Tr. 41, the court sustained an objection to defense counsel's question by saying "[l]et the witness tell the jury what happened to him." Tr. 44. On recross-examination of the complainant, as defense counsel attempted to determine how much time had elapsed during the events in the parking lot, the court said, "[c]ounsellor, no sense arguing with the witness. He says that's his best approximation. This man is coming here to tell what happened to him." Tr. 113. When defense counsel objected to questions propounded by the court during the direct examination of Paul O'Brien, Justice Goldstein asked, "[c]ounsellor, do we want the jury to know all about this case?" Tr. 226. Several transcript pages later, at the outset of defense counsel's cross-exami-

Moreover, the court's questioning might well at times have signalled to the jury that he favored the government's case. Justice Goldstein often took over the questioning from defense counsel. He intervened in counsel's cross-examination of Mr. Landsberg to elicit a description of the four black youths. Tr. 50. While counsel for petitioner was still cross-examining complainant, at the start of the second day of his testimony, the court again took over the questioning and asked Mr. Landsberg to repeat, without interruption, his direct testimony about events in the lot. Tr. 71. Later, during cross-examination of Paul O'Brien, as defense counsel attempted to focus his testimony on the movements of the Maverick, Justice Goldstein intervened to lead the witness through three transcript pages fully recapitulating his testimony on direct examination about his pursuit of petitioner. Tr. 267–69. And at the close of Robert O'Brien's testimony—perhaps the most crucial moment in the trial—Justice Goldstein intervened to have the witness repeat three times in succession that petitioner was the man he saw in the parking lot. A reading of the transcript suggests that Justice Goldstein at times took on the prosecutor's role and converted some of defendant's cross-examinations into repetitious redirect, thereby reinforcing the message that he sided with the People. The often hostile exchanges between defense counsel and the judge aroused by these intrusions on cross-examination provided the jury clear evidence of the judge's feelings. See Tr. 70–71.[6]

■ In contrast to his protective and reassuring attitude toward the prosecution witnesses, Justice Goldstein led the attack on petitioner's credibility. Before the defendant took the stand, the court aided the prosecutor in eliciting from Officer Quinn a damaging, conclusory statement that defendant had given the police conflicting stories; both the question and answer were improper.[7]

---

nation of Paul O'Brien, defense counsel asked the court's assistance in requiring Paul O'Brien "to answer my questions, not [repeat] the story he told before." The court responded, "[d]on't characterize it as a story. This is testimony from a sworn witness." Tr. 238j–38. Again, when defense counsel asked Paul O'Brien whether there was a lamp post in the parking lot, the court ordered, "don't brow-beat a witness. This man is a witness. He came here to tell the jury what he saw, what he did and what he observed." Tr. 254. Later, when defense counsel attempted to prevent Paul O'Brien from testifying to the complainant's hearsay remarks, the court asked: "[d]on't you want him to tell what he·saw to the jury? What he did?" Tr. 263.

**6.** For example, after Justice Goldstein took over the questioning of Paul O'Brien, defense counsel interjected: "May I, at some point, ask a question through all this, because we've just heard this from the direct examination." Tr. 269.

**7.** [Prosecutor]: Isn't it correct, Officer Quinn, when you were speaking with the defendant he gave you a number of·conflicting stories? MR VAN LEER: Objection, your Honor. This is not only leading but prejudicial to my client.
 MISS WILOWSKI: Cross examination. I'm allowed to lead.
THE COURT: Miss Wilowski, the form of the question. You can put a direct question to him on cross examination, you know. "Did

he say the following, if you know? Did he say this on another occasion? Did he say that? You may do it that way, if you care to."
MR. VAN LEER: But the jury has already heard the question.
THE COURT: The question that she put was as follows:. Did this defendant make conflicting statements?
Is that the question? Read it back.
MR. VAN LEER: I prefer it not be three times. The first time was annoying, a prejudicial statement. You want her to read back so it would be three times as prejudicial to my client?
THE COURT: You regard that as prejudicial?
MR. VAN LEER: Yes, I do.
THE COURT: Read the question.
(Whereupon, the following question was repeated by the Court Reporter:
"Question: Isn't it correct, Officer Quinn, when you were speaking with the defendant he gave you a number of conflicting stories?")
THE COURT: What is your answer? Yes or no? Just yes or no?
THE WITNESS: Yes.
Tr. 309–10. The substance of these "conflicting stories" was never presented. The jury was left with the officer's opinion that there were "a number" of them, and that the court considered that opinion sufficient to guide them.

When petitioner took the stand the court did not direct him to "sit back" or to "relax." Instead, within three transcript pages Justice Goldstein was making jokes at petitioner's expense.[8] More serious was his questioning of petitioner in which he often assumed the prosecutor's role. For example, petitioner testified that as he fled from the O'Briens after they found him hiding behind the bush, "A Grand Prix drove into the driveway which I was running across. It hit me. I rolled on the ground. I got up and ran again." Tr. 323.

Justice Goldstein soon interrupted defense counsel and conveyed his disbelief of defendant's story through repeated questioning.[9] Shortly after the prosecutor began her cross-examination of petitioner, Justice Goldstein intervened again, asking questions that the jury could easily understand as likening defendant and his companions to the group of two tall and two short youths that committed the robbery. In the process, Justice Goldstein twice accused petitioner—incorrectly—of changing his testimony.[10] This pattern of aggressive ques-

---

8. Petitioner testified that, rather than a white Maverick, he and his companions were driving a "73 Buick Electra duce [sic] and a quarter, 225." After admonishing defense counsel for repeating petitioner's answer, the court engaged in the following colloquy with petitioner:

> This was a Buick, you say?
> THE WITNESS: Yes, Buick, Electra, 225.
> [Defense Counsel]: What did you say before you said, Electra, 225?
> [The Witness]: Duce and a quarter.
> THE COURT: A duce and a quarter? Was that a dollar and a quarter?
> THE WITNESS: It means Electra, 225. It's a shorter way of saying it.
> THE COURT: A duce and a quarter is shorter than 225?
> THE WITNESS: It's a shorter way of saying.

Tr. 317. The next day the Court made a similar ridiculing comment. As petitioner was describing the group of white youths that stood nearby as he stood near the bush he hid in, the following occurred:

> [THE WITNESS]: There was another dude with a crow bar.
> [THE PROSECUTOR]: Where was he standing?
> THE COURT: He said another dude, not another person.
> [THE PROSECUTOR]: Where was this other dude standing?

Tr. 359.

9. THE COURT: Did I understand you to say that you go [sic] knocked down by an automobile, a Grand prix, and you rolled over?
> THE WITNESS: Yes. When I went into the driveway, I hit my knee and my elbow. And I rolled over the top of the hood.
> THE COURT: Did the car ever go over you? A car hit you and you went over the top of the hood?
> THE WITNESS: I rolled over the top of the hood. It didn't hit me very hard. It grazed me when I was going across the driveway.

Tr. 324. After petitioner resumed his testimony, saying that he ran to a house and asked the inhabitants for help, Justice Goldstein returned to this testimony, clearly seeking to impeach the testimony about being hit by the car. He asked "[d]id you tell anybody you got hit by the car?" Tr. 325. Petitioner then testified that he walked out of the house to the police after they arrived. Justice Goldstein, certainly recalling Officer Quinn's testimony earlier in the day, interrupted with a series of questions designed to expose inconsistencies in petitioner's testimony:

> THE WITNESS: I told [the police] I was being chased by several white dudes and they were trying to kill me.
> THE COURT: You were being chased by several white youths?
> THE WITNESS: Yes.
> THE COURT: Who did you tell that to?
> THE WITNESS: The first policeman that came out with a gun.
> THE COURT: Was that Quinn?
> THE WITNESS: No.
> THE COURT: Did you tell Quinn that you were hit by a Grand Prix and you needed an ambulance?
> THE WITNESS: No.
> THE COURT: Isn't that what you told the woman behind the door?
> THE WITNESS: Behind the front door, yes.
> THE COURT: To call an ambulance, that you were hit by a car?
> THE WITNESS: Yes, because my knee and elbow was hurting.
> THE COURT: Did you tell that to Quinn?
> THE WITNESS: No.
> THE COURT: Did you tell it to anybody?
> THE WITNESS: Only the lady.
> THE COURT: Did you tell anybody at the police station, when you got to the station?
> THE WITNESS: Yes, I told them my knee and elbow was hurt.

Tr. 327–28.

10. THE COURT: How many people were in the car altogether?
> THE WITNESS: Four.
> THE COURT: Were they all the same height as you?
> THE WITNESS: No, I was the tallest one.
> THE COURT: He told you one was five foot one. How tall was the other man?

tioning continued as Justice Goldstein challenged petitioner on his whereabouts, his coat, and his being hit by a car on the night of the robbery.[11]

In sum, Justice Goldstein, by coming quickly to the aid of prosecution witnesses during cross-examination, and by indicating that he credited their testimony and that defense counsel was trying to prevent the jury from hearing the truth, clearly risked leading the jury to "believe that the judge favored the government's witness[es] and [their] version of the facts." His close questioning of petitioner "clearly indicated disbelief in the defendant's testimony." *United States v. Nazzaro,* 472 F.2d at 308–10. This mode of behavior was particularly improper here, where "defendant's guilt or innocence rests almost exclusively on the jury's evaluation of the witnesses' demeanor and credibility." *Id.* at 310.

> THE WITNESS: I don't really know.
> THE COURT: About?
> THE WITNESS: Around five feet.
> THE COURT: One, five feet one. One was five feet. You're six four.
> How tall was the other guy?
> THE WITNESS: I don't know because he was sitting down.
> THE COURT: How long do you know him?
> THE WITNESS: I just met him that night. He was in the car when I got ready to get in.
> THE COURT: Was there a girl in the car?
> THE WITNESS: No.
> THE COURT: Did you ever get to see that girl?
> THE WITNESS: What girl?
> THE COURT: Didn't you tell the lawyer that, I saw my friends, the cousin, and who were the females you were talking about? Three females, and the girls. Where did you get the females and the girls from?
> THE WITNESS: I don't know. See, he was going—he was going to show me—take me out to see somebody.
>
> . . . .
>
> THE COURT: Well on October the 18th, 1976, you told your lawyer about 6:00 or 7:p.m. you were on Hancock Street.
> "I saw my friends, a cousin, females, three fellows—
> MR. VAN LEER: Judge, that's not the testimony, your Honor. Your Honor, that's not the testimony. I would object. Your Honor—
> THE COURT: If there's anything wrong with the testimony, the jury can ask that it be reread, and it will be reread.

Petitioner did not challenge the court's jury charge at trial and this Court must therefore refrain from reviewing the merits of the charge as further evidence of Justice Goldstein's bias. An examination of the charge is appropriate, however, when the claim is that petitioner was denied a fair trial, to determine whether it cured or mitigated the prejudicial impact of the judge's improper acts at trial. *See Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). In this instance the charge could only have exacerbated those errors.

In his charge to the jury, Justice Goldstein continued to convey an impression that he believed that the prosecution witnesses were telling the truth and petitioner was lying. In summarizing the evidence, Justice Goldstein spoke approvingly of the testimony of prosecution witnesses,[12] but

Tr. 334–38. Having the testimony read back made it unlikely that the jury accepted Justice Goldstein's incorrect version of the testimony, but it may not have erased the message that he considered the petitioner's testimony unbelievable and that he believed the group of companions petitioner had described to be the same group that robbed Mr. Landsberg. *See United States v. Marzano,* 149 F.2d at 926.

11. THE COURT: Did you see a bank?
> Did you pass a bank while you were walking, looking for a subway?
> THE WITNESS: No
> THE COURT: Did you pass a parking lot while you were looking for a subway?
> THE WITNESS: No
> THE COURT: Did you tell a cop, when the cops came that you were run over by an automobile?
> THE WITNESS: Yes.
> THE COURT: You told them that?
> THE WITNESS: Yes.
> THE COURT: Did you tell them you needed an ambulance?
> THE WITNESS: I told them I needed some medical care.

Tr. 356. Soon thereafter the court tried again to place petitioner at the scene, again indicating disbelief, asking "[d]id you ever go over a fence while one of the O'Briens was chasing you?" Tr. 364. *See also* Tr. 369.

12. The court stated:
> [Y]ou've heard Landsberg testify, the man who was victimized. . . . You had the two O'Brien brothers who testified. You had Patrolman Quinn who testified. And then *you*

characterized defendant's testimony as "his version of what transpired," or "his position." Tr. 461, 471–72. He went on to frame the issue for the jury in terms of deciding whether to believe petitioner "on the one hand or the testimony of the O'Brien brothers and Officer Quinn." While the judge raised the possibility of misidentification, he quickly merged it into a question of whether the O'Brien brothers "had a motive to lie." He then suggested his own belief that they were not lying—or mistaken:

> Now, if the O'Brien brothers, who came here and testified, are mistaken as to who the defendant was, the law says you must acquit the defendant. If the O'Brien brothers are disbelieved and you don't believe what they told you, you must find the defendant not guilty.

> Do the O'Brien brothers have a motive to lie? If you come to the conclusion that their testimony was incredible and unworthy of belief, find him not guilty. They have given you the description. They told you who they chased. They told you where they chased him, how he got over the bush, how he got over the fence and how they pursued him to the

point where they finally found him when he was in the custody of the police. And they said, "That's the man. He just stuck somebody up."

Tr. 472–73. This summary, moreover, eliminated the break in the O'Briens' observation of petitioner. Its probable effect was to leave the jurors convinced that Justice Goldstein believed the O'Briens chased who they said they chased, and therefore that petitioner was guilty. The judge almost immediately thereafter compounded this impression by reminding the jury to weigh the defendant's self-interest in judging his credibility,[13] without delivering a balancing instruction, which "[u]nquestionably . . . is the court's duty" in this situation, to the effect that the jury "may well find [him] to be truthful, in whole or in part." *United States v. Gleason,* 616 F.2d 2, 4, 15 (2d Cir.1979).

Justice Goldstein's description to the jury of the crimes charged in the indictment gave further support to the improper message he conveyed in his trial conduct. After defining the two types of robbery with which petitioner was charged, Justice Goldstein told the jury "I say it is for the jury to make the determination which of the two

---

had the defendant who testified on his own behalf as to his version of how he happened to be in that vicinity at that time on that occasion.

Tr. 461 (emphasis supplied). Later, the judge said:

> And then came the O'Brien boys who told you what they saw. Each one of them told you how they pursued this defendant. First, O'Brien said he was on his way over the fence. He saw him. "I got a view of him. I got a side view of him."

> Remember, that determining the facts is your department, not mine. The responsibility is yours. As a matter of fact, this robe that I wear is now being transposed upon the shoulder of every juror because actually you are the judges, not I. The responsibility for determining innocence or guilt is yours, not mine.

> And so you recall the testimony of the O'Brien boys who said they saw him on several occasions. They saw him coming out of the bushes. They saw him when he was spread eagle over the car, and they said to the cops, "This is the fellow who just stuck someone up."

Tr. 468.

**13.** The court charged:

> Now, let me tell you what the law is with respect to a defendant taking the stand and testifying in his own behalf. The law says that when a defendant takes the stand and testifies in his own behalf, it is the duty of the jury to scrutinize the testimony of the defendant because the law says that a defendant is an interested witness, and so his testimony must be scrutinized to determine did he give his testimony in such fashion as to have it appear most favorable to himself by reason of the fact that he has an interest in the outcome of the transaction, the outcome of the trial.

Tr. 473–74. Justice Goldstein may also have signaled to the jury his feelings as to the guilt of petitioner in his charge on punishment. "If you find him not guilty, there is no punishment. If you find him guilty, the punishment rests on my shoulders. And I can assure you that my shoulders are big enough and broad enough to assume that responsibility." Tr. 475. This charge was one ground for the reversal in *People v. Branch,* 83 A.D.2d 855, 441 N.Y.S.2d 737, (2d Dep't 1981).

degrees of robbery, one or the other." Tr. 481. He omitted initially to mention the possibility that petitioner was not guilty of either. In qualifying this statement he seems literally to have told the jury it was their "job" to find the defendant guilty:

I don't say he's guilty of any of them because that's not my job. That's your job. And that's why you're here.

Tr. 482. While this statement taken alone appears to have been a verbal slip, the judge later persisted in using similar language, strongly and improperly suggesting to the jury that he considered it their duty to convict:

I sat here, just like you did. I listened, just as you did. If you think for one moment I don't know what's going on, I'd have to be an idiot or a moron not to know. Yet, it's not my job. This is why you are here. So I say to you, when you arrive at a verdict, ask yourselves the question, "Can I go home tonight and say to my wife or my children or, in your case, to a husband, I'm proud of the verdict I rendered. I was a juror in the highest trial court in the State of New York and I'm proud of the verdict I rendered." If you can say that, you can hold your head high. You can look anyone straight in the eye and justly be proud. If you can't, all I say is, remember the oath that you took, "I will try this case fairly and impartially on the testimony to which I listened and nothing else and a true verdict rendered in accordance with the facts as I find the facts to be, as you find them to be, and in accordance with the law as the Judge gave me the law."

Tr. 482–84.

Were this case on appeal from a federal trial court, or an application for postconviction relief by a federal prisoner, a new trial would almost certainly be ordered. Under federal standards, a judge may "analyze the evidence, comment upon it, and express his views with regard to the testimony of witnesses. He may advise the jury in respect of the facts, but the decision of issues of fact must be fairly left to the jury." *United States v. Murdock,* 290 U.S. 389, 394, 54 S.Ct. 223, 225, 78 L.Ed. 381 (1933) (citations omitted). Indeed, "the power of the judge to express an opinion as to the guilt of the defendant should be exercised cautiously and only in exceptional cases," *id.,* such as when guilt is established by "undisputed and admitted facts." *United States v. Woods,* 252 F.2d 334, 336 (2d Cir.1958). Here, as in *Woods,* "the vital facts are seriously disputed," *id.,* and therefore Justice Goldstein's acts, conveying to the jury a clear indication of his belief in petitioner's guilt, would warrant a retrial. "[I]n its zeal for arriving at the facts, the court conveyed to the jury too strong an impression of [its] belief in the defendant's probable guilt to permit the jury freely to perform its own function of independent determination of the facts." *United States v. DeSisto, supra,* 289 F.2d 833, 835 (2d Cir. 1961); *see also United States v. Nazzaro,* 472 F.2d 302, 312 (2d Cir.1973); *United States v. Brandt,* 196 F.2d 653, 656 (2d Cir.1952).

 *Murdock* and its progeny do not state a standard of constitutional dimension, however. *See Davis v. Craven,* 485 F.2d 1138, 1140 (9th Cir.1973) *(en banc),* cert. denied, 417 U.S. 933, 94 S.Ct. 2645, 41 L.Ed.2d 236 (1974). For petitioner to gain a new trial on his habeas petition from state court he must demonstrate that Justice Goldstein's indiscretions so infected the entire trial as to amount to a denial of due process. *See Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973); *Arroyo v. Jones,* 685 F.2d 35, 39 (2d Cir.1982). Petitioner has either made or has come very close to making this exacting demonstration. On balance, the Constitution should be construed to prohibit conduct so inconsistent with the judicial role. Nevertheless, although the trial was unfair to a degree that at least approached a due process violation, the violation was harmless with no likely impact on the ultimate jury verdict.

### III.

The State argued before the Appellate Division, and argues here, that any errors

by Justice Goldstein were harmless. The State's case rested largely on identification testimony, which stemmed from identifications made in less than ideal circumstances for accurate observation. "There is no question that identification testimony is notably fallible, and the result of it can be, and sometimes has been, 'the greatest single injustice that can arise out of our system of criminal law,' namely the conviction of the wrong man through a mistake in identity." *United States v. Evans,* 484 F.2d 1178, 1187 (2d Cir.1973) (citations omitted). Furthermore, nothing that Justice Goldstein said in his charge would have led the jury to act independently of his suggestive actions. He prefaced his charges on reasonable doubt and the presumption of innocence in such a way as to inform the jury that these fundamental rights were legal technicalities of little importance:

> [T]he law requires me to tell the jury about all of the general rules of criminal law that apply in every criminal case across the land because those general rules of criminal law that apply, apply to this case as well, and those legal concepts, we talked about them. And I'm sure you remember them. And I would just assume [sic] avoid using up the energy to discuss them, but the law says that I must and so I will.

Tr. 463. Moreover, his actual charges sounded in such a way as to minimize the quality of proof necessary to erode the presumption of innocence and prove guilt beyond a reasonable doubt.[14] This, plus Justice Goldstein's lengthy summary of pretrial events, including defendant's arrest, detention, and defense counsel's demand for a jury trial, could only exacerbate the effect of his improper trial intrusions. Finally, Justice Goldstein's constant admonitions to the jury that their task was to seek the truth diluted the reasonable doubt standard.[15]

Arguably, because the outcome of this case rested on the credibility of identification testimony, and because the judge failed to cure any misrepresentations of credibility he may have worked upon the jury, *see Nazzaro,* 472 F.2d at 312–13; *DeSisto,* 289 F.2d at 835; *Brandt,* 196 F.2d at 656, it cannot be said that the judge's conduct was "harmless beyond a reasonable doubt." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Harmless error analysis requires that a conviction be sustained on collateral attack where the record establishes, beyond a reasonable doubt, that the judge's indiscretions did not influence the jury's verdict. *See Milton v. Wainwright,* 407 U.S. 371, 373, 377–78, 92 S.Ct. 2174, 2176, 2177–78, 33

---

**14.** The court's charge on reasonable doubt instructed the jury that the government's "witnesses must convince the jury beyond a reasonable doubt that the crime of robbery was committed and that this defendant was a participant in that crime," Tr. 463, but the jury was never advised, as is required under *Mullaney v. Wilbur,* 421 U.S. 684, 705, 95 S.Ct. 1881, 1892, 44 L.Ed.2d 508 (1975), that the prosecution bore the burden of proving each element of the crime beyond a reasonable doubt. With regard to the presumption of innocence, the Court's version made light of that important protection:

> And then I told you that every defendant, not only this defendant, but every defendant in the country, no matter what he's charged with, arson, rape, murder, the law says he's presumed to be innocent. Now, what does that mean? It means he's presumed to be innocent until the evidence in the case that comes from the lips of witnesses convinces the trial jury to the contrary. And when that happens, the presumption of innocence goes

right out the window. It doesn't exist, if the weight of the evidence convinces the jury beyond a reasonable doubt that the defendant participated in the commission of the crime. So much for that.

Tr. 465–66.

**15.** For example, at one point he charged the jury:

> And so, talking about verdicts, let me tell you something: you know, the term "verdict" comes from two Latin words, dictum, to speak; veritas, the truth. Your verdict must be the truth. If it does less than that, it's not a verdict.

Tr. 482. See also Tr. 474. But a jury can return a "not guilty" verdict even if they believe the defendant to be guilty, so long as they hold a reasonable doubt as to his guilt. That, in fact, is the intended function of the reasonable doubt standard, expressing a societal judgment that erroneous "not guilty" verdicts are preferable to erroneous "guilty" verdicts.

L.Ed.2d 1 (1972); *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *Kampshoff v. Smith*, 698 F.2d 581, 586–587 (2d Cir.1983). A full reading of the trial transcript provides a solid basis for concluding beyond a reasonable doubt that the jury would have rendered its verdict without Justice Goldstein's interjections. The government's case was not based solely upon eyewitness testimony, and much of the eyewitness testimony in the case was highly reliable. Furthermore, defendant's testimony was effectively impeached in many respects, and he provided so unlikely an explanation for his presence in the neighborhood that the jury might well have convicted him out of disbelief.

The evidence established that Landsberg was robbed by four black youths. Indeed, the trial judge's failure to instruct the jury on the elements of robbery was harmless, since at no time did the defense dispute that a robbery had occurred. One of the taller youths ran off separately, and climbed over a fence. Before he managed to escape, two witnesses briefly saw him and later described him accurately. He then disappeared, creating a break in the effort to capture him. But these same witnesses again saw a youth who fit his description attempting to get into the same white Maverick in which they had seen the perpetrators. They prevented the youth from entering the Maverick, and chased him when he fled a second time. Some time thereafter they heard rustling in some bushes; the defendant emerged. He conceded at trial—most significantly—that he asked the witnesses why they were chasing him. This testimony established that the defendant was the same individual whom the witnesses had chased earlier, when he was allegedly attempting to get into the white Maverick. The only contested issue regarding identification, therefore, was whether the defendant was also the same individual whom the witnesses had seen even earlier at the scene of the robbery.

Several pieces of evidence independent of identification testimony corroborated the witnesses' assertion that the defendant was the person who ran from the robbery scene. Significantly, the fact that the defendant ran from the witnesses when they sighted him at the white Maverick strongly suggests that he was the same person. Furthermore, he was described by all as a very tall individual, over six feet in height. His clothing was also described; the witnesses testified that he wore a green parka, and the arresting officer corroborated that testimony. after defendant denied having owned a green parka. The witnesses also described the car from which they saw the four robbers emerge, and into which they later saw the defendant attempting to escape. Identifying the car posed far less danger than is normally associated with identifying individuals; and the testimony that the defendant tried to escape in that particular car was especially significant.

Defendant's story also added considerable strength to the government's case. He could not identify the friends he had been with that evening, or the woman they had allegedly gone to Queens to meet. He said the car he had travelled in was not a white Maverick, but he could not supply information sufficient to identify any other car. He claimed to have been the victim of a racial attack, but the O'Briens were unassailably truthful in describing their motive for chasing defendant; they appeared on the scene just as Landsberg was being robbed, and chased the criminals. Moreover, his own version placed him in the neighborhood with three other friends who fit the physical descriptions supplied by the witnesses, and the conflict in testimony gave the jury a strong basis for finding that the defendant had lied. In short, the strength of the evidence establishing petitioner's guilt made Justice Goldstein's help in convicting petitioner unnecessary. The State, therefore, should not now be called upon to pay the price of his harmless indiscretions.

### IV.

One could argue that the trial judge's conduct and instructions were so

lacking in judicious impartiality that habeas relief should be awarded as a measure for discouraging such behavior. The right to a fair trial is fundamental, and the interest in deterring biased conduct by trial judges is strong; arguably, a new trial should be required in every case involving such conduct, given their infrequency. An unfair judge contaminates the system of criminal justice. He undermines confidence in the process by which guilt is determined, and therefore in a very real sense constitutes an institutional deficiency warranting correction at any reasonable price. An occasional retrial or release would seem a small price to pay to make unequivocal the message that judges must not abuse their authority by forsaking impartiality.

In the present case, petitioner's counsel has demonstrated that Justice Goldstein's deficiencies may indeed be so profound as to constitute an institutional defect warranting some sacrifice to correct. The Appellate Division has reversed Justice Goldstein in some 22 of 27 reported opinions since 1977, most of which related to his conduct or to his faulty instructions. Several reversals of the judge's decisions occurred before the petitioner's trial, but his behavior and practices were apparently unaffected by the state-court corrections.

Yet, unless the trial practice rendering the trial unfair amounts to a prejudicial constitutional infraction, the federal courts lack authority and are without power to disturb trustworthy convictions of state prisoners. In the Supreme Court's most recent Term it reiterated that considerations of comity should cause federal courts to be hesitant to disturb state-court convictions, unless the petitioner has succeeded in demonstrating a prejudicial and fully preserved constitutional error. *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). Principles of comity control here, where petitioner's guilt was established beyond reasonable doubt notwithstanding the error.[16]

Furthermore, while Justice Goldstein's record is disconcerting, the very lack of respect his judgments have commanded is reassuring. If Justice Goldstein constituted a defect of institutional proportions, the Appellate Division, Second Department, which reviews convictions obtained before him, has effectively performed its own institutional role. It has repeatedly corrected his mistakes, and insisted upon trials that are fair by standards far more exacting than those that the federal courts are authorized to impose. The federal habeas corpus jurisdiction is neither a necessary nor an appropriate vehicle in this case for engaging in further corrective measures.[17]

The petition for habeas corpus is denied.

SO ORDERED.

16. It is likely, in fact, that the Appellate Division affirmed petitioner's conviction on a similar harmless error analysis. New York's appellate courts often refrain from exercising their interest of justice jurisdiction, N.Y.Crim. Proc.Law § 470.15 (McKinney 1971), to reverse criminal verdicts when overwhelming evidence demonstrates the defendant's guilt. *See People v. McNeely,* 77 A.D.2d 205, 433 N.Y.S.2d 293, 299 (4th Dep't 1980); *People v. Jones,* 32 A.D.2d 1069, 1070, 303 N.Y.S.2d 921, 922 (2d Dep't 1969), 27 N.Y.2d 501, 260 N.E.2d 870, 312 N.Y.S.2d 677 (1970).

17. While counsel for petitioner, who has so ably presented his case, should appeal this decision to the Court of Appeals, she should also consider seeking relief in the state courts. Even if the Second Department agrees that the errors in this case were harmless, it might be inclined to grant a new trial or to reduce the 15-year sentence imposed by Justice Goldstein—a remedy which only that court has the power to grant and which it has exercised in the past to reduce Justice Goldstein's excessive sentences. *See People v. Sangas,* 79 A.D.2d 1011, 436 N.Y.S.2d 999 (2d Dep't 1981); *People v. Peterson,* 72 A.D.2d 800, 421 N.Y.S.2d 830 (2d Dep't 1979); *People v. Williamson,* 71 A.D.2d 632, 419 N.Y.S.2d 877 (2d Dep't 1979), *aff'd,* 51 N.Y.S.2d 801, 412 N.E.2d 1319, 433 N.Y.S.2d 93 (1980). In the present case, after the jury returned its verdict, Justice Goldstein saw fit to deliver to them a lecture on the need to restore the death penalty, even though the trial was for robbery in which the victim, though placed in mortal fear, was unhurt. Tr. 526.